## UNITED STATES DISTRICT COURT
## DISTRICT OF RHODE ISLAND

| | |
|---|---|
| **LOUIS KWAME FOSU,** <br> *Plaintiff,* <br><br> **vs.** <br><br> **UNIVERSITY OF RHODE ISLAND, et al.,** <br> *Defendants.* | **C.A. No. 21-00279-JJM-PAS** |

### PLAINTIFF'S MEMORANDUM IN SUPPORT OF OBJECTION TO DEFENDANTS' MOTION TO DISMISS

Plaintiff Louis Kwame Fosu ("Professor Fosu"), by and through his undersigned counsel, submits this response to Defendants' Motion to Dismiss ("MTD" or "Motion") Counts II-VII of Plaintiff's Complaint ("Complaint" or "Compl.").

### I. INTRODUCTION

In 2019, Defendant University of Rhode Island ("URI") recruited Professor Fosu to join the faculty as a professor in the Political Science department. Professor Fosu has a distinguished academic, policy, and legal career as an advocate and counsel on a range of social and political issues. Consistent with his reputation, Professor Fosu received excellent evaluations and performance reviews and praise from URI students and faculty.

In the middle of the academic year 2020-2021, Professor Fosu's status changed for the worse. Professor Fosu taught a class on advocacy that was praised by his department chair and warmly received by his students. As part of his curriculum and in response to student interest, Professor Fosu supported his students' attempts to shine a light on racial discrimination at URI in

1

the aftermath of the horrific events involving the murder of George Floyd. In this turbulent time, Professor Fosu supported his students' efforts to seek racial justice and address long-standing racial discrimination and tension at URI. For this reason, Defendants responded with a characteristic response – they singled Professor Fosu out by conjuring up false accusations of misconduct, launched a pretextual investigation, and brought the full legal and administrative power against him in order to silence him, his students and ultimately the community. Professor Fosu was made the scapegoat by URI in an attempt to suppress any scrutiny of URI's long-standing and abysmal record of racial discrimination that has permeated the campus, the students, the faculty and the community. The lengths to which URI has gone reflected the ultimate truth of URI's horrific record of racial discrimination. The levers of URI's power have been – and continue to be – massive. Fortunately, Professor Fosu, like the civil rights forefathers of our country, has been left with one last venue to seek justice and restore his professional reputation -- the U.S. federal court system. Professor Fosu filed his Complaint with only one goal in mind – to seek justice and shed light on URI's demonstrable history of racial discrimination. Professor Fosu's motivation is not a financial recovery; in fact, his singular goal is to bring racial justice to URI and elevate the status of long-suppressed minorities at URI so that URI can begin to heal and shine as a leader of racial justice in Rhode Island.

Despite this challenge, URI's response so far has been to circle the wagons and engage in a defensive and revealing tactic – ignore the message and attack the messenger. URI's tactics are in keeping with a long tradition of racist institutions in this country. This is nothing new and our country is well aware of why and how far URI will go to protect itself from scrutiny and acknowledgment. When Professor Fosu and his students sought to engage Defendants in an honest

dialogue and discussion on racial issues, Defendants' response was characteristically defensive – deny a request to meet and discuss student concerns, and then launch a vicious attack against Professor Fosu by painting him as an instigator, smearing him with reckless allegations and ultimately firing him.

Notwithstanding his excellent performance at URI, in the middle of the 2020-2021 academic year, without a shred of due process, the Defendants abruptly silenced and suspended Professor Fosu. The Defendants took this unjustified action under the cloak of deceit and for one reason only – because Professor Fosu, as part of his authorized teaching curriculum, supported his students' initiatives to raise enduring race and diversity issues at URI. Consistent with its long-standing record of systemic racism and denial of equal opportunities, URI did not embrace truth and honesty, but viciously retaliated against Professor Fosu to prevent him from joining with students to promote an honest and transparent discussion of URI's discriminatory practices and record.

Rather than embracing its professed commitment to critical conversations and thoughtful action, URI set to attack Professor Fosu personally and professionally. When challenged to address these important issues, Defendants began a pre-textual investigation to manufacture reasons to terminate Professor Fosu's employment in a way that would both shame Professor Fosu and would provide a legal façade to support its evident desire to terminate his employment. As outlined in his Complaint, Professor Fosu did not back down to Defendants and had the courage to challenge the smear campaign against him and bring transparency to URI so that it could address its persistent, institutionalized, and systemic discrimination.

Before commencing this litigation, Professor Fosu called on URI to apologize and make amends for its retaliatory actions. Instead of issuing an apology as it had with other similarly situated (but white) professors who spoke out on politically-charged, controversial issues, URI double downed and fired him, breaching its contract and violating Professor Fosu's due process and equal protection rights. Now, Defendants have filed a lengthy, baseless Motion seeking to silence Professor Fosu yet again, asking this Court to deprive him of his opportunity to expose Defendants' misconduct and present his claims to a jury of his peers.

As opposed to immediately addressing the very serious First Amendment issues raised in the Complaint, Defendants seek delay in the discovery process and trial by moving to dismiss some, but not all counts in the Complaint. Accepting as true all well-pleaded allegations of fact in the Complaint, and drawing all reasonable inferences therefrom in the light most favorable to Professor Fosu, as required at this stage of the action, Professor Fosu has more than adequately pled all counts in the Complaint. As demonstrated below, this Court has solid legal and factual grounds to deny Defendants' Motion for at least the following reasons:

- Defendants argue that Professor Fosu has no property interest in his contract because the contract did not "guarantee" Fourteenth Amendment due process rights. MTD at 10. But that is not the standard. Professor Fosu only needs to plead that he had a "reasonable expectation" of continued employment at URI, which he has sufficiently pled in the Complaint.

- Defendants argue that Professor Fosu did not provide details on those similarly situated to him for equal protection purposes under the Fourteenth Amendment. MTD at 11-12. Nothing is further from the truth, as Professor Fosu has pled that similarly situated professors were disciplined differently and held to another standard.

- To undermine Professor Fosu's state law claims for due process, equal protection, and freedom of speech, Defendants argue that such rights have not been recognized in Rhode Island. MTD at 13-14. Defendants overstate the reach of Rhode Island caselaw and ignore applicable state and federal precedent that support these causes of action.

4

- Defendants disingenuously suggest that Professor Fosu only pled two (2) defamatory statements in the Complaint, where in fact he has pled no less than six statements. MTD at 15. These statements were part of a vicious and aggressive campaign to destroy Professor Fosu's reputation and were defamatory as a matter of law. Defendants are in no manner entitled to a privilege, their intentions were malicious and meant to send a chilling message to students and faculty to distance themselves from Professor Fosu.

- Defendants argue for complete preemption of Professor Fosu's breach of contract claim, MTD at 22-24, when in fact, the Supreme Court has held that an employee covered by a collective bargaining agreement is not precluded from asserting a claim for breach of contract based on a separate contract. Professor Fosu is not required to pursue all available remedies through the collective bargaining procedure; he holds constitutional and statutory rights that exist separate and independent from his available rights under the collective bargaining agreement.

- Professor Fosu has pled the quintessential case of retaliation under the Rhode Island Whistleblower's Protection Act ("RIWPA"). Defendants argue that he has not sufficiently alleged that he engaged in protected activity under RIWPA. MTD at 24-27. On the contrary, Professor Fosu's Complaint sets forth numerous instances of the protected activity that forms the basis of his RIWPA claim.

For these and the reasons set forth below, Defendants' Motion should be denied in its entirety. In the alternative, if this Court deems Professor Fosu's pleading to be insufficient in any respect, Professor Fosu respectfully requests the opportunity to file an Amended Complaint to cure any deficiencies.

## II.    STANDARD

To survive a motion to dismiss, "a complaint must provide 'a short and plain statement of the claim showing that the pleader is entitled to relief.'" *García-Catalán v. United States*, 734 F.3d 100, 102 (1st Cir. 2013) (quoting Fed. R. Civ. P. 8(a)(2)). At this stage, "the plaintiff need not demonstrate that she is likely to prevail, but her claim must suggest 'more than a sheer possibility that a defendant has acted unlawfully.'" *Id.* at 102-03 (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)); *see also Lipshires v. Behan Bros., Inc. Retirement Plan*, 502 F.Supp.3d 682, 685

(D.R.I. 2020). The Court must accept a plaintiff's allegations as true and construe them in the light most favorable to the plaintiff. *Fitzgerald v. Harris*, 549 F.3d 46, 52 (1st Cir.2008). The complaint must contain sufficient factual matter to state a claim plausible on its face. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

"In determining whether a complaint crosses the plausibility threshold, 'the reviewing court [must] draw on its judicial experience and common sense.'" *García-Catalán* at 103 (alteration in original) (quoting *Iqbal*, 556 U.S. at 679). "This context-specific inquiry does not demand 'a high degree of factual specificity.'" *García-Catalán*, 734 F.3d at 103 (quoting *Grajales v. P.R. Ports Auth.*, 682 F.3d 40, 47 (1st Cir. 2012)).

## III.   ARGUMENT

### A.   Professor Fosu Has Sufficiently Pled Federal Due Process and Equal Protection Claims at the Motion to Dismiss Stage

#### 1.   Professor Fosu has pled facts giving his claim of property interest sufficient plausibility.

As alleged in the Complaint, Professor Fosu was appointed to teach in the Department of Political Science beginning the 2019-2020 academic year through 2024-2025. Compl. ¶¶ 46, 100. The original contract with Professor Fosu is dated July 1, 2019 and offers Professor Fosu the opportunity to teach through 2024-2025 contingent on an "annual evaluation/review of teaching and student advising performance."  Compl., Exhibit 2; MTD, Richard Decl., Ex. A. As noted by Defendants, Professor Fosu accepted the offer and the contract was signed by both parties, Dean Riley on behalf of URI and Professor Fosu. The contract in unequivocal terms states it "supersedes all other agreements, oral or written, between the parties and is the complete agreement" between the parties. *Id*.

In their Motion, Defendants cite to a letter dated May 15, 2020, as the "operative" document for purposes of Professor Fosu's due process rights and protected property interest. MTD, Richard Decl., Ex. C. The May 2020 letter does not refer to an offer or acceptance nor does it contain the superseding language in the July 2019 employment contract. Furthermore, it is not signed by Professor Fosu. Defendants cite to the May 2020 letter to deflect away from the robust obligations and protections included in the July 2019 employment contract and to minimize the significance of the employment contract. Pursuant to the employment contract, URI was obligated to follow certain procedures before it could terminate Professor Fosu. Yet it followed no procedures, not even the relevant URI policies, leading to the type of "arbitrary" employment action the Due Process Clause of the Fourteenth Amendment seeks to prevent. *Rivera–Muriente v. Agosto–Alicea*, 959 F.2d 349, 352 (1st Cir.1992).

The Due Process Clause "'guarantees public employees who have a property interest in continued employment the right to at least an informal hearing before they are discharged.'" *Id*. (quoting *Kauffman v. Puerto Rico Tel. Co*., 841 F.2d 1169, 1173 (1st Cir.1988)). Defendants summarily state that "Plaintiff has not pled and cannot show" the constitutionally protected property interest at stake here because URI did not guarantee Professor Fosu's employment. MTD at 10. But a guarantee is not needed. "A person has a constitutionally-protected property interest in continued public employment when he has a **reasonable expectation** that his employment will continue." *Rodriguez-Cortes v. Superintendencia del Capitolio*, Civil No. 15–1535, 2015 WL 7012639, at *2 (D.P.R. Nov. 12, 2015) (emphasis added). At the motion to dismiss stage, a plaintiff does not need to "fully plead the law providing them a property interest; they only have to plead facts that would give their claim of a property interest sufficient plausibility." *Vazquez–Velazquez*

*v. Puerto Rico Highway and Transportation Authority*, Civil No. 15-1727, 2016 WL 183653, at *5 (D.P.R. Jan. 14, 2016) (citing *Johnson v. Shelby*, 574 U.S. 10, 11 (2014).

Defendants argue that both the CBA and Professor Fosu's appointment letter fixed the term of his employment for only the 2020-2021 academic year. This is simply not true. First, the CBA in no manner fixed the term of employment in the contract. It is silent and leaves the parties with the discretion to fix the term. As stated, the May 15, 2020 letter is not the controlling document, the July 1, 2019 employment contract controls. The employment contract contains no language that terminates the agreement after one year. Quite the opposite, it contains a provision for renewal. Why would the contract reference renewals through 2024-2025 if it was strictly limited to one year?

Defendants cite to *Board of Regents v. Roth*, 408 U.S. 564 (1972) to support their case of a lack of property interest. MTD at 10. In *Roth*, the Supreme Court held an assistant professor at a state university who was hired for a "fixed term of one academic year," did not have a due process right to a statement of reasons and a hearing when the university decided not to renew his contract after he "completed that term." *Roth*, 408 U.S. at 566. The contract at issue in that case was expressly limited to the "academic year" and had "no provision for renewal whatsoever." *Id.* at 578.

Here, the Complaint pleads that Professor Fosu had a reasonable expectation of continued employment because he had a written contract to teach through 2024-2025, contingent on an "annual evaluation/review and student advising performance." Compl. ¶46. In contrast to the plaintiff in *Roth*, Professor Fosu's contract did not limit the term to one academic year. Professor Fosu was under the impression that he would be evaluated annually and only terminated for cause.

But even with positive performance reviews and accolades from peers and supervisors, Defendants terminated Professor Fosu without providing him any of the required procedures to allow him to defend himself. Compl. ¶¶ 70–85. This was done purposefully and intentionally to silence Professor Fosu. These facts must be taken as true and construed in the light most favorable to Professor Fosu at the motion to dismiss stage.

Even assuming that Professor Fosu's property interest did not extend beyond 2021, Defendants lose because they effectively terminated Professor on January 12, 2021, in the middle of the 2020-2021 academic year, thereby stripping him of his property interest in that academic year. As Defendants state, it is "undisputed" that Professor Fosu had a property interest for the 2020-2021 academic year. MTD at 6. In contrast to the plaintiff in *Roth* who completed his full academic year, Professor Fosu was placed on an indefinite administrative leave in the middle of the year, restraining him from participating in any of his teaching duties or any other obligations. Compl. ¶¶ 70-73. This abrupt and harsh action was purposely done while faculty and students were on break between semesters so that Professor Fosu could not attempt to hear or see the purported evidence against him.

URI alleges that it placed Professor Fosu on leave to investigate alleged student reports against him, but discovery will show that the real reason was to terminate him, and to do so strategically so it could argue that, like the university defendants in *Roth*, it simply chose not to renew his contract. Alleged student reports against Professor Fosu were manufactured and pretextual so that URI could immediately get rid of him. URI kept Professor Fosu on the payroll to shield itself from due process claims. The fact that URI decided to pay Professor Fosu while on leave does not take away from the fact that they deprived him of his property interest in continued

teaching and his liberty interest in his reputation, all without so much as a meeting. As this Court has astutely noted, "[s]uspension, regardless of whether it is paid, is adverse to the employee in and of itself. It is punitive in nature and at a minimum becomes part of one's permanent employment record, affecting one's ability for advancement, or to find other future employment, or gaining valuable job experience." *Mosunic v. Nestle Prepared Foods Co*., 274 F.Supp.3d 22, 27 (D.R.I. 2017). If Defendants' behavior was condoned, state institutions could circumvent due process by putting anyone on leave as long as it was paid leave. This cannot be the law.

Here, URI Defendants have stained Professor Fosu's reputation by labelling him "hostile, disrespectful and/or non-collegial." Compl. ¶¶ 77, 116. In fact, if the university defendants in *Roth* had attacked the plaintiff's reputation, the Supreme Court may have found for the plaintiff as it stated:

> The State, in declining to rehire the respondent, did not make any charge against him that might seriously damage his standing and associations in his community. It did not base the nonrenewal of his contract on [such] charge . . . Had it done so, this would be a different case. For '(w)here a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him, notice and an opportunity to be heard are essential.'

*Roth*, 408 U.S. at 573 (quoting *Wisconsin v. Constantineau*, 400 U.S. 433, 437 (1971)). As the First Circuit has held, due process requires a public-sector employer to provide its employee with a hearing "where a public-sector employer creates and disseminates a false and defamatory impression about an employee in connection with the employee's discharge." *Wojcik v. Mass. State Lottery Comm'n*, 300 F.3d 92, 103 (1st Cir. 2002) (citing *Roth*, 408 U.S. at 573); *see also Ortega-Rosario v. Alvarado-Ortiz*, 917 F.2d 71, 74 (1st Cir. 1990) (holding that there are circumstances in which a public employer's decision to discharge an employee "may damage the employee's reputation to such an extent that his 'liberty' to seek another job is significantly

10

impaired."). As discussed in the defamation section below, Professor Fosu has sufficiently pled that Defendants made a number of defamatory statements impugning his name and reputation.

In sum, Professor Fosu's due process claim succeeds at the motion to dismiss stage. The second due process prong is straightforward. Before terminating Professor Fosu, Defendants made no attempt to satisfy even the minimal due process requirements. Professor Fosu received no notice of any complaint or due process procedure before being placed on leave, even though he maintained a close relationship with his department supervisor. This Court need not determine the plausibility of the second prong or make any factual inferences, since Defendants admit these key facts.

### 2. The Complaint sufficiently pleads that Defendants violated Professor Fosu's Fourteenth Amendment right to equal protection.

Professor Fosu's Complaint sufficiently pleads that Defendants ran afoul of the Equal Protection Clause. "The Equal Protection Clause contemplates that similarly situated persons are to receive substantially similar treatment from their government." *Tapalian v. Tusino*, 377 F.3d 1, 5 (1st Cir.2004) (citation omitted). The two requisite prongs for an equal protection claim consist of 1). a reasonable conclusion that Professor Fosu was selectively treated, when compared to others similarly situated, and 2). such selective treatment was based on an impermissible consideration such as race, religion, or intent to inhibit or punish the exercise of constitutional rights. *Id.* at. 6. Defendants make two points in their attempt to dismiss the equal protection claim. First, Defendants argue that Professor Fosu cannot espouse a "class of one" theory in a public employment lawsuit to prove that he was selectively treated. Second, Defendants state that Professor Fosu's equal protection claim does not plead any protected status.

11

As to the "class of one" theory, Professor Fosu's response is simple because Professor Fosu does not raise that theory. The Complaint makes clear that Professor Fosu's equal protection claim rests not on a class of one, but on the principle that "all persons similarly situated should be treated alike…" *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985).[1]  As alleged in the Complaint, Defendants disciplined Professor Fosu differently and more harshly than similarly situated professors at URI. Compl. ¶ 108. These similarly situated professors were white and to be clear, discovery will show that Professor Fosu was singled out for adverse and differential treatment in relation to comparable white colleagues.

For example, Defendants are well aware that URI Professor Erik Loomis made controversial comments regarding gun control and the NRA and most recently, on the police killing of a Portland protestor. Professor Loomis was treated better than Professor Fosu. URI did not fire Professor Loomis for his speech and in fact eventually put out a message affirming support for his freedom of speech.[2]  Another white professor, Professor Donna Hughes made transphobic statements in a blog post and was treated better than Professor Fosu. URI publicly condemned her statements but supported her freedom of speech and no disciplinary action was taken against her,

---

[1] Defendants posit that Professor Fosu's pleading "fails to provide the necessary specificity about alleged comparators."  MTD at 12. Defendants cite a First Circuit Case, *Zell v. Ricci*, 957 F.3d 1 (1st Cir. 2020) to support their proposition. The Defendants fail to mention that *Ricci* involved a class-of-one equal protection claim, which applies when a plaintiff does not claim membership in a class or group. *Id.* at 14. This is not the case here.

[2] URI stated, "The University of Rhode Island strongly believes that Constitutionally protected rights to free expression are the foundation of American democracy, and central to our mission of imparting knowledge and promoting the exchange of ideas. It is our conviction that Professor Loomis's personal remarks, however intemperate and inflammatory they may be, are protected by the First Amendment."  Second Statement from URI President David M. Dooley on Prof. Erik Loomis, (Dec. 23, 2012) at https://www.thefire.org/second-statement-from-uri-president-david-m-dooley-on-prof-erik-loomis/.

certainly not the extreme measure of termination.[3] These professors were given due process and Defendants honored their academic freedom to teach and speak accordingly. By punishing Professor Fosu without a hearing and discipling him differently and more harshly than similarly situated white professors at URI, Defendants deprived Professor Fosu of his entitlement to procedures of fundamental fairness.

Professor Fosu has adequately pled that he was selectively treated compared with others "similarly situated."   As the First Circuit has proclaimed, "The determination as to whether individuals are "similarly situated" for equal protection purposes is an amorphous one . . . '[t]he test is whether a prudent person, looking objectively at the incidents, would think them roughly equivalent and the protagonists similarly situated . . . Exact correlation is neither likely nor necessary. . .'" *Tapalian*, 377 F.3d at 5 (quoting *Barrington Cove Ltd. Partnership v. Rhode Island Housing & Mortgage Finance Corp.*, 246 F.3d 1, 8 (1st Cir.2001) (citation omitted)). Thus, Professor Fosu was similarly situated in his teaching duties as to other white professors, but was disciplined more harshly due to the manner in which he spoke and his race.

With respect to the second prong of equal protection, Professor Fosu has adequately alleged that the selective treatment imposed on him was due to his race and speech. At the outset of the Complaint, it is noted that "Plaintiff is a black man" and Professor Fosu has alleged that the discrimination against him was motivated by his race as he was subject to harassment, retaliation

---

[3] URI stated, "The University honors and respects the right to freedom of speech under the First Amendment for all citizens, including our faculty, without censorship or retaliation. The University also recognizes that its faculty have the general right to 'academic freedom' in their teaching and scholarship . . ."   URI News External Relations and Communications, University response to anti-transgender statements, (Mar. 23, 2021) at uri.edu/news/2021/03/university-response-to-anti-transgender-statements/.

and intimidation. Compl. ¶¶ 3, 7, 14-17. The Complaint pleads that URI engaged in race-based discrimination. Compl. ¶¶ 8-10, 15, 26, 55. The Complaint pleads that Professor Fosu "challenged [URI] on its discriminatory record." Compl. ¶ 7. Defendants claim that Professor Fosu must show that the adverse treatment against him was based on a "malicious or bad faith intent to injure." MTD at 12. Again, Defendants are mistaken. The malicious or bad faith intent is a showing required under the class of one theory. *Tapalian*, 377 F.3d 1, 5 (1st Cir. 2004) (holding that a plaintiff not relying on "typical" impermissible categories, such as race or religion, must show different treatment was based on a malicious or bad faith intent to injure).

Discovery will reveal the true extent of Defendants' racial discrimination and selective treatment. At the motion to dismiss stage, "Plaintiffs…cannot, have all the requisite information within their possession to successfully bring an Equal Protection Clause claim, Plaintiffs merely need to present 'enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal [conduct].'" *Association of Victims of Medical Malpractice v. Torres-Nieves*, Civil No. 12-1812, 2013 WL 12234545, at *14 (D.P.R. Sept. 30, 2013) (quoting *Twombly*, 550 U.S. at 556). Plaintiff has alleged sufficient facts showing "a plausible entitlement to relief" pursuant to the Equal Protection Clause. Accordingly, this Court should reject Defendants' Motion directed at Count III of Professor Fosu's Complaint.

**B.   Professor Fosu's State Law Constitutional Claims Survive Defendants' Motion**

   **1.   Professor Fosu's equal protection and due process claims are guaranteed by the state constitution**

Defendants argue in favor of dismissal of Count IV of Professor Fosu's Complaint, insofar as it alleges a violation of Article 1, Section 2 of the R.I. Constitution.[4] Relying upon a recent decision of the Rhode Island Supreme Court, Defendants contend that there is no private cause of action pursuant to Article 1, Section 2 of the R.I. Constitution. MTD at 13 (*citing Jane Doe v. Brown University*, 253 A.3d 389 (R.I. 2021)). However, Defendants fail to note that the Rhode Island Supreme Court's holding in *Doe* was limited to the "issue of whether the antidiscrimination clause creates a private cause of action." *Id.* at 399. The Rhode Island Supreme Court did not address the state law claims of due process and equal protection. Given its limited holding, *Doe* has no persuasive value here. Since Defendants overstate the reach of *Doe*, and ignore applicable state and federal precedent recognizing such a cause of action for due process and equal protection under the R.I. Constitution, Defendants' Motion on this point must be denied.

The new constitution adopted by the Constitutional Convention and the voters of Rhode Island in 1986 explicitly provided for a state law due process and equal protection cause of action. As succinctly recited by now-retired Judge Lagueux in *Jones v. State*, 724 F. Supp. 25 (D.R.I. 1989), this Court held:

> The drafters of the revised Constitution supplemented the 'advisory' language of Article I, Section 2 by adding the specific guaranty that
>
> > No person shall be deprived of life, liberty or property without due process of law, nor shall any person be denied equal protection of the laws. . .

---

[4] As pointed out by Defendants, Article 1, Section 2 contains three clauses – a due process clause, an equal protection clause and anti-discrimination clause. Professor Fosu's Complaint states a cause of action pursuant to all three clauses. Based upon *Doe*, Professor Fosu does not object to the dismissal of Count IV only insofar as it states a cause of action pursuant to the anti-discrimination clause.

> The intent of the drafters in adding a 'due process' and an 'equal protection' clause to the new Constitution clearly was to parallel the language of the Fourteenth Amendment to the United States Constitution. R.I. Const. art. I, § 2 (annotated edition). The Constitutional Convention Committee Report on this subject stated that including these protections in the state Constitution 'would create an independent state foundation for individual rights.' *Id.* (quoting the *Committee Report,* p. 6). . . [t]his Court, therefore, must conclude at this point in time that in adding such a provision, the drafters intended to create an implicit right to sue state actors for damages for violations of this newly created right.

*Jones*, 724 F.Supp. at 34-35. In *Jones*, this Court went on to conclude that "there is an implied right to sue a state official individually for damages resulting from an alleged violation of the due process clause of Article I, Section 2 of the Rhode Island Constitution."  *Id.* at 35; *see also Taylor v. State*, 726 F. Supp. 895, 901 (D.R.I. 1989) (reiterating its holding in *Jones* and allowing for the new due process and equal protection provisions to create constitutional causes of action . . .").

The Rhode Island Supreme Court has similarly found an implied right to sue pursuant to the due process and equal protection clauses of the R.I. Constitution. *Pellegrino v. Rhode Island Ethics Comm.*, 788 A.2d 1119, 1126 (R.I. 2002) (holding R.I. Constitution created vested property interest relative to ethics commission members pay and that this property interest "could not be taken from them for the public's use without due process of law."); *see also Abbatematteo v. State*, No. 91-7403, 1992 WL 813561, at *4 (R.I. Super., May 29, 1992) (following *Jones* and with respect to the state law equal protection claim "reject[ing] defendants' argument that no such cause of action exists under the R.I. Constitution").

Defendants cite to *Bandoni v. State*, 715 A.2d 580 (R.I. 1998) to conversely argue that the Rhode Island Supreme Court has not found a cause of action pursuant to Professor Fosu's state

constitutional claims. MTD at 13. However, Defendants' reliance on *Bandoni* is misplaced. In *Bandoni*, the Rhode Island Supreme Court recognized that each clause of the state constitution is entitled to a separate analysis on whether that clause gives rise to a private right of action. *Bandoni,* 715 A.2d at 599. The Court found no private cause of action pursuant to Article 1, Section 23, the victims' rights amendment of the Rhode Island Constitution, but limited its reach and explicitly held that the victims' rights amendment should not and could not be compared to equal protection or due process provisions in state constitutions:  "Rhode Island's victims' rights amendment simply cannot be compared to New York's equal protection clause, North Carolina's free speech clause, or Maryland's due process or search and seizure clauses, as the dissent attempts to do." *Id*. However, in this case, Rhode Island's equal protection and due process clauses can be compared to other states' due process and equal protection clauses.[5]

In fact, in *Bandoni*, the Rhode Island Supreme Court hinted to the possibility that state due process and equal protection clauses are self-executing. For example, the Court noted that a private right of action does lie under the R.I. Constitution's Takings Clause. *Id.* at 599 (citing *Annicelli v. Town of S. Kingstown*, 463 A.2d 133 (R.I. 1998). The Court highlighted that the takings clause is a self-executing provision and confirmed that the phrase "without just compensation" expressly signifies a private remedy. *Id.* Applying the Court's reasoning in this case, the phrase "without just compensation" is tantamount to the phrase "without due process of law," and without "equal

---

5 Other jurisdictions, in addition to New York, North Carolina and Maryland, have held that equal protection or due process provisions in their state's constitution provide for a direct cause of action. *See, e.g., Taylor v. Bixby*, 415 P.3d 537, 543 (Ct. App. Ok. 2017) (citing prior Oklahoma Supreme Court precedent holding a private right of action for due process violations of the state constitution).

protection of the law." In both cases, the clause is "complete in itself, it executes itself." *Id.* at 587 (quoting *Davis v. Burke*, 179 U.S. 399, 403 (1900)).

At the motion to dismiss stage, Defendants have not demonstrated that Professor Fosu's Complaint does not adequately state a cause of action pursuant to Article 1, Section 2 for alleged due process and equal protection violations. These claims are not encompassed by other state law remedies such as FEPA and RICRA, and as Judge Lagueux pointed out in *Jones*, there are no "special factors counselling hesitation in this area." *Jones*, 724 F.Supp. at 34-35.

### 2. Professor Fosu's state law freedom of speech claim equally survives Defendants' Motion

Defendants assert that Professor Fosu's state law freedom of speech claim cannot survive a motion to dismiss for the same reasons as its other state constitutional claims – that there is no private cause of action pursuant to the R.I. Constitution for a violation of Article 1, Section 21. Defendants are wrong because the Rhode Island Supreme Court has recognized the viability of such a claim in *Felkner v. Rhode Island College*, 203 A.3d 433 (R.I. 2019). Felkner, a student at Rhode Island College, pled both state and federal freedom of speech and freedom of expression claims in relationship to his experience as a politically conservative student in a liberal social work program. *Id.* at 440-45, 447. On review, the Rhode Island Supreme Court reversed the trial court's decision granting defendant's summary judgment, holding that Felkner's claims that defendant's professors violated his rights to free speech and expression should be resolved by a jury. In doing so, the Court found both Felkner's state and federal free speech and expression claims were viable. Accordingly, the Defendants argument that no cause of action exists under state law for a violation of Article 1, Section 21 must be rejected.

Defendants also point out that even if such a claim exists, no violation of Professor Fosu's rights may lie under Section 21 because Professor Fosu has not set forth any law "abridging [his] freedom of speech."  MTD at 14 (quoting Article 1, Section 21).  Defendants conveniently ignore the entirety of Section 21, which provides (as expected) a more expansive set of rights: "The citizens have a right in a peaceable manner to assemble for their common good, and to apply to those invested with the powers of government, for redress of grievances, or for other purposes, by petition, address, or remonstrance. No law abridging the freedom of speech shall be enacted."

**C. Professor Fosu Has Sufficiently Pled a Claim for Defamation Against Defendants**

**1. Professor Fosu identified at least six, not two, defamatory "publications"**

Defendants' Motion disingenuously suggests that Professor Fosu has only pled two (2) defamatory statements. MTD at 15. But Professor Fosu has alleged – and will prove – that Defendants engaged in a systematic campaign to defame and destroy his reputation in retaliation for shining a light on racism at URI through **numerous** false and defamatory statements, verbal and written, no less than six of which were specifically identified in the Complaint.

**First**, as noted in the Complaint at paragraph 57, Defendants' campaign to destroy Professor Fosu's reputation through spurious student complaints began on October 27, 2020, the "morning after Professor Fosu sent the" Declaration of Diversity ("DOD") to senior administration officials at URI and the URI Board of Trustees. On that date, "Defendant Riley emailed Professor Fosu about an alleged student complaint," which Dr. Riley refused to discuss with Professor Fosu, and which URI has never substantiated. Compl. at ¶¶57-59. Dean Riley falsely stated in the October 27, 2020, email that "there was concern expressed about the nature of your email communications with the class."  Exhibit 1, Copy of October 27, 2020 e-mail communications

19

between Professor Fosu and Defendant Riley. Professor Fosu "respond[ed] immediately," and asked, "to meet regarding this complaint from the student," but Dean Riley dismissed him out of hand, stating "[t]here is no need to meet at this time." *Id.* Professor Fosu has reason to believe that Dean Riley shared the October 27, 2020 communication, or at least the substance thereof, with other individuals, and he is entitled to discovery to prove such publication.

**Second**, in paragraph 68 of the Complaint, Professor Fosu quoted from a December 7, 2020, email signed **by both Defendant Dooley and Defendant DeHayes**, which further defamed Professor Fosu. This email alone defeats Defendants' argument that no statement may be attributed to President Dooley. In the email, Defendants refused to meet with Professor Fosu's class, alleging that Professor Fosu was imposing his opinions on his students, and accused Professor Fosu of attempting to "demonize" members of URI and damage its good name and reputation through "inaccurate" and "unsubstantiated" statements and "attacks." When read "holistically," as Defendants urge in their Motion, the December 7, 2020 email is degrading and damaging, insofar as it wrongfully accuses a professor of abhorrent and unprofessional conduct, including, "imposing" his opinions on students, advancing his agenda, failing in his research and advocacy skills, "demonizing" his peers, and damaging his employer. Although Professor Fosu is not required to present evidence at this stage of the litigation, the entire email from Defendant Dooley and Defendant DeHayes is quoted below for this Court to judge its defamatory nature (emphasizing the false and defamatory statements):

> Dear Professor Fosu:
>
> Normally we would be pleased to meet with any class to learn directly from students about the details of their class projects. In this case, however, it is clear that the document that you refer to as the Declaration of Diversity was written by you and represents ***your opinions being imposed on students*** and

others. The document includes ***numerous inaccurate statements*** as well as ***unwarranted, unsubstantiated, and defamatory personal attacks*** on several members of the URI community. Furthermore, the document also ***causes unwarranted damage to the good name and reputation of the University***. We cannot in any way condone such ***overt attacks*** and ***your efforts to demonize members of our community*** with whom you may have disagreements. In our view, the document that you have prepared is ***neither well-researched nor effective advocacy*** for the critically important efforts needed to advance diversity, equity, and inclusion at URI. For the reasons we have noted, we are not willing participate in this exercise, which appears to be ***designed primarily to support your platform rather than student learning.*** Finally, we are deeply disappointed that you have put our students in a position of having to promote and/or defend your personal agenda.

**Third**, at paragraph 70 of the Complaint, Professor Fosu quoted from a January 12, 2021 letter, which Defendants quoted in their Motion. MTD at 18. **Fourth**, at paragraph 78, Professor Fosu quoted from a January 22, 2020 memorandum, which Defendants also quoted in their Motion. MTD at 19-20. Because these statements were the sole focus of Defendants' Motion, they are discussed further at length below. **Fifth**, at paragraph 79 of the Complaint, Professor Fosu referred to "another letter from Defendant DeHayes [dated April 16, 2021] in which Defendant DeHayes posits more 'complaints and reports of concern' from students and employees…" **Sixth**, at paragraph 81, Professor Fosu referred to "a May 11, 2021, letter from Defendant DeHayes to Professor Fosu, informing Professor Fosu that URI was eliminating his position and attaching a copy of the final investigation report." In the letter, Defendant DeHayes, copying several other individuals, once again falsely accused Professor Fosu of "coercion, intimidation, and retaliation toward students" and "hostility, harassment, and disrespectful and threatening behavior toward colleagues." Not only is the investigation report full of false and defamatory statements, but Professor Fosu has reason to believe that, during the course of the "investigation," Defendants

and/or their agents (including the purported investigators), made additional false and defamatory statements about Professor Fosu to third parties, including Professor Fosu's students and peers.

It is only after specifically identifying these six publications that Professor Fosu does plead, as Defendants note, that other false and defamatory statements against Professor Fosu "'will be revealed through discovery in this action.'" MTD at 21 (quoting Compl. at ¶116). But this is more than "speculation," as Defendants contend. *Id.* Professor Fosu has pled and will prove that Defendants engaged in a "vicious and aggressive campaign to destroy" his reputation by concocting complaints and repeatedly broadcasting that Professor Fosu was intimidating, disrespectful, and/or hostile towards students and staff. Compl. ¶7. Professor Fosu also noted in the Complaint, at paragraph 76, that "several faculty and students suddenly began disassociating themselves" from him and his advocacy groups which, at this stage of the litigation, clearly gives rise to the plausible conclusion that Defendants published false and defamatory statements to many individuals who shunned Professor Fosu as a direct result. *See Garrett v. Tandy Corp.*, 295 F.3d 94, 106 (1st Cir. 2002) (holding in a defamation case, "[a]t the Rule 12(b)(6) stage, then, it is enough for a plaintiff to sketch a scenario which, if subsequently fleshed out by means of appropriate facts, could support an actionable claim," thus "the appellant is entitled to discovery in order to clarify exactly what was said and to develop the facts necessary to put what was said in a meaningful context").

### 2. Defendant's statements were defamatory as a matter of law

Defendants argue that Professor Fosu has not met the burden of pleading a statement that, when taken in context, would injuriously affect a person's reputation, degrade him in society, or bring him into public hatred and contempt. MTD at 16 (*citing Burke v. Gregg*, 55 A.3d 212, 219

22

(R.I. 2012)). Yet it is hard to imagine a comment about a professor that is any more degrading and damaging than falsely accusing him of "coercion, exploitation, and intimidation" of his students, and being "hostile, disrespectful and/or non collegial" towards faculty in general and "misogynistic and abusive" towards female faculty. These are serious allegations of an inability to perform his job duties and have the potential to permanently damage Professor Fosu's reputation. What student would want to take a class with such a professor; what university would want to engage such a professor; and how would a female staff member or student ever respect or desire to work with such a professor? Such language is defamatory in any context. *See, e.g., Wesbrook v. Ulrich*, 90 F.Supp.3d 803, 811 (W.D.Wis. 2015) (ruling on a motion to dismiss that defendant's statements that plaintiff's management style was "coercive," "threatening," "abusive," and "contentious," were capable of a defamatory meaning).

Defendants also cite *Marcil v. Kells*, 936 A.2d 208, 219 (R.I. 2007), for the proposition that the "'decisive question is what the person or persons to whom the communication was published reasonably understood as the meaning intended to be expressed.'" MTD at 16-17 (quoting *Marcil*, 936 A. 2d at 213). Defendants' defamatory meaning was clear. In fact, as noted in the Complaint at paragraph 76, there is substantial evidence that persons to whom the communications were published "understood" the intended defamatory meaning because they actually stopped associating with Professor Fosu. This case is nothing like the cases cited by Defendants where the "offensive" or "egregious" statements were not actionable as a matter of law. MTD at 16 (citing cases using words like "paranoid" or "silver-tongued devil").

3. **Defendants' statements purportedly "issued for the purpose of an internal personnel action," give rise to a claim for defamation**

Defendants argue their statements about Professor Fosu are not actionable because they were made in the context of an "internal personnel action," and shared only with URI and faculty union personnel. MTD at 15. Defendants do not cite a single case to support their proposition, and it is unclear whether Defendants are suggesting that such distribution does not constitute a "publication," and/or Defendants are suggesting that such publication was privileged.

Later in the section of their Motion, Defendants argue Professor Fosu failed to plead "an unprivileged communication to a third party," because Defendants are entitled to a qualified, "intra-corporate privilege." MTD at 19-21. In this section of their Motion, Defendants predominantly rely on out-of-state authorities (from Connecticut, Georgia, Louisiana, and South Carolina). Curiously, Defendants neglected to mention *Quinn v. City of Newport*, No. 17-012-JJM-PAS, 2019 WL 1989837 (D.R.I. May 6, 2019), a case in which this Court had an opportunity to rule on a similar matter. In *Quinn*, a police officer in the Newport Retired Officer Corps brought a defamation action against the defendants on the basis of an email that was circulated internally among the members of the police department. *Id.* at *2. Although the Court did not discuss the intra-corporate privilege in its opinion, this Court denied the defendants' motion for summary judgment, finding the internally communicated statement was actionable as a matter of law. *Id.* at *6. Here, too, even assuming the statements about Professor Fosu were only circulated internally among URI and the faculty union, such statements are actionable. A jury should decide whether Defendants defamed Professor Fosu.

Defendants note, the "Rhode Island Supreme Court has yet to interpret specifically whether a defamation claim can be based upon the intra-corporate sharing of a personnel action among administrators. . . " MTD at 21. But the Rhode Island Supreme Court has considered similar

matters and held that internal corporate communications do constitute publications. The issue is whether the publishers are entitled to a qualified privilege. *See, e.g., Ponticelli v. Mine Safety Appliance Co.*, 104 R.I. 549, 555, 247 A.2d 303, 308 (1968) ("Clearly, of course, an occasion otherwise conditionally privileged cannot be sustained if the defamatory statements have been induced by malice."). In *Ponticelli,* for example, an employer had a qualified privilege to disclose to its employees that plaintiff was terminated for wrongdoing because the employer had an interest in deterring future, similar misconduct. *Id. at 308; see also Ventetuolo v. Burke*, 470 F. Supp. 887, 897 (D.R.I. 1978) (defendant had a qualified privilege to distribute termination letters to individuals within the regional and national level of a public institution and its funding agency due to a common interest in the "personnel of the local office, with whom they had frequent dealings," but that "this privilege is only qualified, not absolute").

The Rhode Island cases cited by Defendants in their Motion actually support Professor Fosu and demonstrate that Defendants' Motion should be denied. MTD at 21. In *Ims v. Town of Portsmouth*, 32 A.3d 914 (R.I. 2011), the Rhode Island Supreme Court reversed the lower court's decision to grant the plaintiff's Rule12(b)(6) motion to dismiss the defendants' defamation counterclaim based on a demand letter or "notice of claim" that the plaintiff submitted as part of a town council meeting. The Court held the plaintiff had a "right to petition for redress of grievances," which gave rise to a qualified privilege, but the defendants were entitled to show that the plaintiff lost the privilege because the "allegedly defamatory statement [wa]s the product of ill will or malice." *Id.* at 930. Here, too, even assuming Defendants were entitled to a qualified common interest privilege, Professor Fosu has pled, and will show, that they lost and abused that privilege.

In *Avila v. Newport Grand Jai Alai, LLC*, 935 A.2d 91 (R.I. 2007), "[a]fter the parties conducted discovery," the Rhode Island Supreme Court affirmed the lower court's grant of defendant's motion for summary judgment because the plaintiff did not overcome the applicable qualified privilege. *Id.* at 94. Although the "existence of a qualified privilege" is a question of law, "ordinarily," "the determination of the primary motivation of a defendant [i]s a question of fact, not to be dealt with on summary judgment." *Id.* at 95-96. Here, at this stage of litigation, before discovery, dismissal is inappropriate. Professor Fosu is entitled to discovery and to eventually present evidence to a jury that Defendants abused any qualified privilege to which they may have been entitled.

Finally, in *Ponticelli,* discussed above, the plaintiff appealed from the lower court's directed verdict for the defendants. Noting that "[w]hether ill will or spite is the incentive for a publication is ordinarily for the jury to decide . . .," the Rhode Island Supreme Court held the plaintiff did not present sufficient evidence of malice "to get to the jury the question of whether the occasion for the privilege was abused." *Ponticelli*, 247 A.2d at 309. Professor Fosu has pled that Defendants' statements were "false and malicious, not privileged." Compl. ¶116. At this stage of litigation, he has met his burden.

Defendants also contend that "[n]ationally, courts have varied in their interpretation of the intra-corporate privilege, where an allegedly defamatory statement was circulated or shared internally for legitimate business purposes." MTD at 20. This may be true, but the overwhelming weight of authority holds that statements are sufficiently published for defamation purposes when they are recited in an interoffice document. *See e.g., Torosyan v. Boehringer Ingelheim Pharm.*, 234 Conn. 1, 662 A.2d 89, 103 (1995) ("Although intracorporate communications once were

considered by many courts not to constitute 'publication' of a defamatory statement, that view has been almost entirely abandoned . . ."); *Gambardella v. Apple Health Care, Inc.*, 291 Conn. 620, 969 A.2d 736, 746 (2009) ("it is clear that the settled law in Connecticut is that a showing of either actual malice or malice in fact will defeat a defense of qualified privilege in the context of employment decisions."); *Robertson v. Barber Foods, LLC*, No. 2:19-cv-00455-NT, 2020 WL 3104047, at *6 (D.Me. 2020) (plaintiff sufficiently alleged his supervisor abused any qualified privilege that might attach to "statements among a company's own employees"); *Alden v. Office Furniture Distributors of New England, Inc.*, No. 1:10-cv-00316-GZS, 2011 WL 2971660, at *9 (D.Me. 2011) ("Pursuant to Maine common law, defamatory 'intra-corporate communications' made by a corporate agent about an employee will expose the corporation to liability for defamation even if the publication is kept 'within the corporate community.'") (citation omitted).

Finally, intra-university statements frequently give rise to state law claims for defamation. In *Tacka v. Georgetown Univ.*, 193 F. Supp. 2d 43 (D.D.C. 2001), for example, a professor sued Georgetown University for defamation in connection with a failed application for tenure. The professor claimed that an agent of the university defamed him by publishing an accusation of plagiarism to the departmental rank and tenure committee and others in the university community. *Id.* at 49. The defendant argued the publication was entitled to a qualified privilege because it was made to assist the University in making an informed decision about promotion and tenure. *Id.* at 53. The district court held there were genuine issues of material fact relating to malice and excessive publication, which prevented the defendant from prevailing on the basis of a qualified privilege on a motion for summary judgment. *Id.* at 54. Similarly, there is a host of caselaw that prevents defendants from prevailing on qualified privilege at the pleading stage of litigation. *See*

*e.g., Issa v. Delaware State University*, 268 F.Supp.3d 624, 636–37 (D.Del. 2017) (denying university provost's motion to dismiss defamation claim based on qualified common interest privilege because the assistant professor's complaint alleged that the provost made "statements that he knew to be false," with "bad faith and ... malice," and that the university's "ill will" towards plaintiff stemming from his complaints of  "harassment, racial discrimination, and retaliation," was the "chief motive" for making the statements); *McDaniel v. Loyola University Medical Center*, No. 13-cv-6500, 2019 WL 12312024, at *4 (N.D.Ill. Nov. 20, 2019) ("a jury should be allowed to determine whether [defendant] abused the qualified privilege when he informed the panel [of a university medical center residency program] that Plaintiff had failed the boards," because "[v]iewing the record as a whole, a jury could conclude that [defendant] should have known his statement was false but made it to cover up the termination of Plaintiff for pretextual reasons."); *Aslin v. University of Rochester*, 6:17-cv-06847, 2019 WL 4112130, at *21 (W.D.N.Y. Aug. 28, 2019) (statements to university department chair and among faculty members could constitute defamation; "statements therefore may or may not be protected by the common interest privilege and state a viable claim for defamation at the pleading stage.").

Accordingly, this Court should reject Defendants' Motion directed at Count V of Professor Fosu's Complaint.

### C. Professor Fosu's Complaint Sufficiently Pleads a Breach of Contract Claim Which is Separate and Independent of section 301 of the Labor Management Relations Act.

Defendants offered Professor Fosu a teaching position, with a reasonable expectation to run through 2024-2025. Professor Fosu accepted that offer, and Defendants refused to honor that contract or its own internal policies when placing him on administrative leave and then firing him. To divert the Court's attention from the fact that Defendants have breached their obligations,

Defendants cite to the Labor Management Relations Act ("LMRA") and to URI's collective bargaining agreement ("CBA") in hopes that the LMRA will preempt discovery of the truth.

Defendants offer a number of cases to allude to an argument that the LMRA completely preempts any state law contract dispute. But such is not the case. There are uncertainties surrounding when preemption is valid and at what stage in litigation. The Supreme Court has noted, "[N]ot every dispute concerning employment, or tangentially involving a provision of a collective-bargaining agreement, is pre-empted by § 301 or other provisions of the federal labor law." *Allis–Chalmers Corp. v. Lueck*, 471 U.S. 202, 211 (1985).

In fact, the Supreme Court has held that employees covered by a collective bargaining agreement may assert a claim for breach of contract based on a separate contract. *Caterpillar Inc. v. Williams*, 482 U.S. 386 (1987). Even if they could have brought an action under section 301, plaintiffs, "as masters of the complaint," choose which path to pursue. *Id.* at 394-395. The test for preemption is whether the state law claim can be read independent of the CBA agreement; that it is not substantially dependent on analysis of a CBA. *Id.* "*Caterpillar* makes clear that in order for there to be section 301 preemption, the plaintiff, in its well-pleaded complaint, must plead an action that requires interpretation of the collective bargaining agreement." *Berda v. CBS, Inc.*, 881 F.2d 20, 25 (3d Cir.1989).

In this case, Professor Fosu has not relied on the CBA in framing his Complaint. This Court should not consider the CBA, attached by Defendants as Ex. C to their Motion, as part of the pleadings. *Alternative Energy, Inc. v. St. Paul Fire & Marine Ins. Co.*, 267 F.3d 30, 33 (1st Cir.2001) ("Ordinarily, a court may not consider any documents that are outside of the complaint, or not expressly incorporated therein, unless the motion is converted into one for summary

judgment.") (citation omitted). As pled, Professor Fosu's state law breach of contract claim is based on the employment contract, not on the CBA. No consultation with the CBA is needed; the employment contract contains the appointment period. As this Court has recently noted, "[a] state-law claim is considered independent of a CBA when 'resolution of the state-law claim does not require construing the collective-bargaining agreement.'" *Sankey v. UTGR, Inc.*, No. 19-634-JJM-PAS, 2020 WL 1158465, at *3 (D.R.I. 2020) (quoting *Lingle v. Norge Division of Magic Chef, Inc.*, 486 U.S. 399, 407 (1988)). "Mere consultation of the CBA does not compel preemption." *Id.* (citing *Poole v. Mackey*, 891 F. Supp. 2d 255, 259 (D.R.I. 2012)).

In *Sankey*, a plaintiff, who was fired from her job, filed numerous state law claims against her former employer. Similar to this case, Defendants in *Sankey* moved to dismiss the claims by arguing that LMRA preempts them. This Court held that at the motion to dismiss stage, the state law claims were not preempted under the LMRA, because the Court did not have sufficient facts to determine if the state law claims arose from a breach of duty under the CBA. *Id.*

As in *Sankey*, Defendants present a host of factual issues which can only be resolved through further analysis and discovery. For example, Defendants allege that Professor Fosu's first action after being placed on administrative leave on January 12, 2021 was to contact his union representative. MTD at 23. This is simply not true. Professor Fosu did not reach out to his union representative nor did his union representative give Professor Fosu any notice that he was to be put on leave or any mention of procedures under the CBA. Professor Fosu received no phone call or text from URI Provost, Defendant DeHayes or URI President, Defendant Dooley.

Furthermore, URI did not reference or raise the CBA at any point when it unjustly placed Professor Fosu on leave on January 12, 2021. In fact, if the CBA were controlling as the

Defendants argue, then Defendants would have followed certain disciplinary procedures in the CBA which they clearly did not. This was not a collective bargaining-based termination. Thus, provisions of the CBA are not in dispute. As the First Circuit has put it, a "real interpretive dispute" regarding the CBA must exist for preemption purposes. *Martin v. Shaw's Supermarkets, Inc.*, 105 F.3d 40, 42 (1st Cir.1997).

Accordingly, this Court should reject Defendants' Motion directed at Count VI of Professor Fosu's Complaint.

### D. Professor Fosu More than Adequately Pleads an Actionable Claim under The Rhode Island Whistleblowers' Protection Act.

Defendants' argument that Professor Fosu has failed to adequately plead a claim pursuant to the Rhode Island Whistleblowers' Protection Act ("RIWPA"), G.L. 1956 § 28-50-1 *et seq.* must also be rejected. Professor Fosu's case is an archetype of a claim under RIWPA. "To make out a *prima facie* case under the [RIWPA], a plaintiff must demonstrate the following: (1) that he engaged in protected whistleblowing conduct as defined by the [RIWPA]; (2) that he suffered an adverse employment action at the time or thereafter; and (3) that the adverse action was causally related to the protected conduct." *Casey v. Manni*, 449 F. Supp.3d 1, 3 (D.R.I. 2020). Defendants lodge no challenge to Professor Fosu's Complaint with regard to whether he has pled sufficient facts to establish that he suffered materially adverse employment actions or that there is a causal relationship between his protected conduct and those actions. Instead, Defendants' challenge is directed at the first element, whether he has sufficiently alleged that he engaged in the requisite protected activity.

To establish the first element, a plaintiff "'need not establish that the conduct [ ] he opposed was in fact'" unlawful. *Johnston v. Urban League of R.I., Inc.*, C.A. No. 09-167S, 2011 WL

2297655, at *6 (D.R.I. May 17, 2011) (quotation omitted). Rather, a plaintiff may rest on the "reasonable belief that Defendants' conduct violated state and/or federal anti-discrimination laws." *Id*. Contrary to Defendants' claims, Professor Fosu's Complaint does in fact set forth the protected activity that forms the basis of his RIWPA claim. In particular, Professor Fosu's Complaint avers:

- URI engaged in race-based discrimination. Compl. ¶¶ 8, 9, 10, 15, 26, 55.

- Professor Fosu "challenged [URI] on its discriminatory record." Compl. ¶ 7.

- One of the ways Professor Fosu challenged URI on its discriminatory record was to publish a document that listed grievances concerning race-based discrimination at URI. Compl. ¶ 53.[6]

- That document was called a "Declaration of Diversity" ("DOD"). Compl. ¶ 54.

- "In the DOD, the authors were clear about their views and opinions on *systemic racism, lack of diversity and racial inequities at URI*." Compl. ¶ 55 (emphasis added).

- In addition to sending the DOD to senior administration officials and the URI Board of Trustees on October 26, 2020, Professor Fosu *"also freely shared his opinions and criticisms about URI's systemic race discrimination in the hiring, treatment and promotion of African Americans*." Compl. ¶ 56 (emphasis added).

It is beyond question that when an employee complains about race-based discrimination in hiring, treatment and promotion and about systemic racism, lack of diversity and racial inequities

---

[6] The Complaint contains additional instances of protected activity in ¶ 66-68. In that instance, Professor Fosu alerted Professor Hutchinson that he was taking steps to "externally advance the DTT advocacy." Compl. ¶ 67. The RIWPA also protects employees who are *about to* make complaints about discrimination.

in the workplace these are sufficient instances of "protected conduct" that plainly satisfy a retaliation claim. *See, e.g., Ruffino v. State Street Bank & Trust Co.,* 908 F. Supp.1019, 1044 (D. Mass. 1995) ("[i]t is well established that where an employee complains . . .discrimination under Title VII and he or she reasonably believes his or her allegations to have some foundation, that employee has satisfied the first element of the prima facie case."); *Johnston*, 2011 WL 2297655 at *6 (holding that plaintiff presented a "trialworthy" claim and sufficiently pled protected conduct under RIWPA when he complained about employment discrimination to his employer).

As this Court is well aware, race-based discrimination is prohibited by both state and federal law.[7]   Defendants argue that Professor Fosu is required to cite the specific anti-discrimination law that Defendants violated in the course of his protected conduct to plead a claim pursuant to RIWPA. MTD at 25. Defendants are simply wrong. An employee engages in protected conduct when they complain about discrimination, even if the employee does not reference a specific statutory citation to his employer. *See, e.g., Rein v. ESS Group, Inc.*, 184 A.3d 695 (R.I. 2018).

In *Rein*, the Rhode Island Supreme Court reversed a decision of the trial court granting the employer's motion to dismiss the plaintiff's RIWPA claim on the basis that the employee did not sufficiently articulate the law upon which his protected activity was premised. *Id.* at 702. The Court held that, at the motion to dismiss stage, "viewing the allegations pled in the complaint as true, this Court cannot conclude that Rein would not be entitled to relief under the [RIWPA] count. From our review of the four corners of the complaint . . .[t]he complaint also adequately alleged

---

[7] In particular, race-based discrimination is prohibited by the Rhode Island Fair Employment Practices Act ("FEPA"), G.L. 1956 § 28-5-1 *et seq*. and Title VII of the Civil Rights Act of 1964 ("Title VII"), among other state and federal laws.

that Rein 'complained to his supervisors, including, but not limited to, defendant [], of violations of state and/or municipal laws and/or regulations by the [d]efendants'" *Id.* at 702-703. Accordingly, Rein did not have to cite the specific law he alleged to have been violated, he only had to allege that he complained about violations. *Id.* at 703.

Defendants' citation to *Gill v. Alexion Pharmaceuticals, Inc.*, C.A. No. 18-696 WES, 2019 WL 3470771 (D.R.I. July 31, 2019) is inapposite. In that case, this Court dismissed a RIWPA claim at the motion to dismiss stage where the plaintiff "fail[ed] to plead any details whatsoever describing the substance of his complaints." *Id.* at *2. As listed above, Professor Fosu's Complaint sets forth numerous instances of the protected activity that forms the basis of his RIWPA claim.

In short, to adopt the higher burden at this stage advanced by Defendants would render the protections of most anti-retaliation laws, such as the RIWPA, meaningless. Given the public policy of the RIWPA is "'to encourage the prompt reporting and early, amicable resolution of potentially dangerous workplace situations, and to protect those employees who do report such violations from retaliatory action by employers,'" and given there is arguably no more dangerous workplace situation than a discriminatory workplace, Defendants' hyper-technical analysis of Professor Fosu's claim should be disregarded at this stage. *Dacier v. Anchor Medical Associates*, 322 F. Supp.3d 295, 299 (D.R.I. 2018) (quoting *Malone v. Lockheed Martin Corp.*, 2009 WL 2151706, at *12 (D.R.I. July 16, 2009)), *aff'd,* 610 F.3d 16 (1st Cir. 2010)). Accordingly, this Court should reject Defendants' Motion directed at Count VII of Professor Fosu's Complaint.[8]

---

[8]With respect to URI's limited argument regarding the definition of employer under the RIWPA, Professor Fosu does not object to dismissal of the RIWPA claim against URI officials in their individual capacities. *See, e.g., Johnston v. Urban League of R.I.*, 2009 WL 3834129, at *4 (D.R.I. 2009).

## IV. CONCLUSION

For the reasons set forth above, this Court should deny Defendants' Motion.

Plaintiff,
By his Attorneys,

/s/ Jessica Sanderson
_____
Jessica Sanderson, *Pro Hac Vice*
The Volkov Law Group, LLC
2200 Pennsylvania Ave, NW
Washington, DC 20037
(240) 505-1992
jsanderson@volkovlaw.com


/s/ Carly Beauvais Iafrate
_____
Carly Beauvais Iafrate, #6343
Law Office of Carly B. Iafrate, PC
38 North Court St., 3rd Fl.
Providence, RI 02903
(401) 421-0065
(401) 421-0964 (fax)
ciafrate@verizon.net

## <u>CERTIFICATION</u>

The undersigned hereby certifies that this document has been filed electronically on this 30th day of September 2021 and is available for viewing and downloading to the ECF registered counsel of record:

Steven Richard, Esq.
srichard@nixonpeabody.com


/s/ Carly Beauvais Iafrate
_____