UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

Louis Kwame Fosu

v. Case No. 21-cv-279-SJM-AKJ

University of Rhode Island
Board of Trustees, et al.

O R D E R

Pro se plaintiff Louis Kwame Fosu brings claims against his former employer, the University of Rhode Island ("URI"); President of URI's Board of Trustees, David M. Dooley; URI Provost and Vice President for Academic Affairs, Donald DeHayes, and Dean of the URI College of Arts and Sciences, Jeannette Riley. He alleges civil rights claims under 42 U.S.C. § 1983, racial discrimination in violation of Title VII of the Civil Rights Act of 1964, and claims under Rhode Island law. Doc. no. 36. Defendants move for summary judgment on all claims. Doc. no. 118. Fosu has not objected or otherwise responded, despite having been granted additional time to file a response. For the reasons that follow, the motion for summary judgment is granted as to Fosu's federal claims and the court declines supplemental jurisdiction over the state law claims.

## Standard of Review

Summary judgment is appropriate when, based upon the record presented for purposes of the motion, "there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute is genuine "if the evidence would enable a reasonable factfinder to decide the issue in favor of either party." Alicea v. Cincinnati Inc., 166 F.4th 245, 253 (1st Cir. 2026) (internal quotation marks omitted). "Facts are material if they might affect the outcome of the suit under the governing law." Arocho-Rodriguez v. Concepcion, 177 F.4th 39, 43 (1st Cir. 2026) (internal quotation marks omitted).

In the District of Rhode Island, the party moving for summary judgment must file a separate statement of undisputed material facts with numbered paragraphs and citing evidence in support. LR Cv 56(a)(1) & (2). "For purposes of a motion for summary judgment, any fact alleged in the movant's Statement of Undisputed Facts shall be deemed admitted unless expressly denied or otherwise controverted by a party objecting to the motion." LR Cv 56(a)(3). If the party opposing summary judgment disputes the moving party's factual statement, the opposing party must file a statement of disputed facts, with correspondingly numbered paragraphs, that identifies the evidence that establishes the factual dispute. Id.; see also Karmue v. Moore, 654 F. Supp. 3d 118, 125 (D.R.I. 2023).

Because Fosu has not responded to defendants' motion, the court will accept as uncontested defendants' recitation of the material facts.[1]

## Background

### I. Procedural Background

Fosu was represented by counsel when the original complaint was filed and through filing of the second amended complaint. Counsel withdrew from representation in late 2023. Fosu has proceeded pro se since that time.

Fosu filed a series of motions that the court denied, stating that "[t]he motions not only request no proper court relief, but they are also scurrilous and inaccurately describe defense counsel's conduct in this litigation, which this Court has seen to be nothing but professional, ethical, and proper." Doc. no. 58, at 1. Fosu then moved to disqualify the judge presiding in this case, followed by a series of motions

[1] On the day his objection to defendants' motion for summary judgment was due, Fosu filed a motion to unseal documents that defendants filed in support of their motion for summary judgment. Doc. no. 134. In that motion, Fosu asserted that he will file an objection to the motion for summary judgment and argues that he disputes the statement of facts defendants provided in support of their motion. Id. at 3. That filing is not an objection to defendants' motion and does not establish a genuine dispute of material facts for purposes of summary judgment. See Fed. R. Civ. P. 56(a); LR Cv 56(a)(3). Therefore, Fosu's motion to unseal is not considered for purposes of defendants' motion for summary judgment.

seeking the same relief. After eighteen months, the judge recused from the case, stating: "Louis Kwame Fosu has again moved to recuse the judge who has presided over this case for over three years. In the present motion, Mr. Fosu continues to make statements about the judge that are false and incendiary. After years of false accusations from Mr. Fosu, the Court has finally reached its limit in its ability to be fair and impartial to Mr. Fosu in this case." Doc. no. 72.

After all judges in the District of Rhode Island recused, the case was reassigned to the undersigned judge, sitting by designation. Before reassignment, Fosu moved to withdraw from the case. Doc. no. 67. After reassignment, the court interpreted Fosu's motion to seek voluntary dismissal of his claims under Federal Rule of Civil Procedure 41(a)(2), granted the motion, and closed the case.[2] Doc. no. 84. Fosu appealed that decision and also moved to alter judgment in which he explained that he did not intend to dismiss his claims and, along with other relief, sought to reinstate his claims. Doc.

---

[2] Fosu brought a separate suit in the District of Rhode Island against the lawyers and law firm that represented URI in this case. Fosu v. Richard, 25-cv-691-SM (filed Dec. 31, 2025). After the judges in the District of Rhode Island recused, that case was also reassigned to the undersigned judge. Defendants' motion to dismiss was granted, and judgment entered on June 25, 2026. Fosu appealed that decision. He also filed a second suit against URI officials, Fosu v. Larsen, 26-cv-532-MSM-PAS (filed Aug. 5, 2026), and has moved for recusal of the sitting judge in that case.

no. 87. The court granted Fosu's motion to the extent that the case was reinstated. Doc. no. 97.

The court then set a schedule for summary judgment motion. Doc. no. 100. Fosu moved for the undersigned judge to recuse and also moved for appointed counsel. Doc. nos. 102 & 103. Both motions were denied. Doc. nos. 106 & 107. Fosu then filed motions to "correct the record" because he disagreed with a statement the court quoted from Fosu's previous counsel's motion to withdraw from representing him and moved for reconsideration of the court's orders. Doc. nos. 109, 111, 113, & 114. Those motions were denied.

Defendants moved for summary judgment, and Fosu's response was due on August 14, 2026. Doc. no. 118. Fosu then moved for an explanation of the recusal orders issued in this case, which was denied. Two days before the deadline for his response to defendants' motion for summary judgment, Fosu moved for an extension of 180 days. Doc. no. 124. The court noted that Fosu had not met his burden to support his request but nevertheless extended the deadline for 30 days, until September 14, 2026.

Fosu did not file an objection to the motion for summary judgment within the time allowed. On the day his objection to defendants' motion for summary judgment was due, Fosu filed a motion to unseal documents that defendants filed in support of their motion for summary judgment. Doc. no. 134. In that

motion, Fosu asserted that he will file an objection to the motion for summary judgment and argues that he disputes the statement of facts defendants provided in support of their motion. Id. at 3. That filing is not an objection to defendants' motion and does not establish a genuine dispute of material facts for purposes of summary judgment. See Fed. R. Civ. P. 56(a); LR Cv 56(a)(3).

Then, Fosu filed two motions to correct or clarify previous orders issued by the court. Doc. nos. 136 & 137. In the first motion, Fosu objects to the court's "characterization" of long-past motion to withdraw from this case. Doc. no. 136, at 1. In the second, he objects to the court's reference to his "voluminous irrelevant exhibits" filed in support of his motion for an extension of time. Doc. no. 137, at 1. Neither motion is an objection to defendants' motion for summary judgment. None of the recently-filed motions is considered for purposes of defendants' motion for summary judgment.

As such, Fosu filed no response to defendants' motion for summary judgment. Under Local Rule Cv 56(a)(3), Fosu admits the facts in defendants' statement of undisputed facts (document no. 119).

## II. Factual Background

### A. Fosu's Employment at URI

In 2018, URI recruited and hired Dr. Gifty Ako-Adounvo, as Vice Provost for Global Initiatives and Senior International Officer. Doc. no. 119, ¶¶ 1, 38-43. Dr. Ako-Adounvo asked for URI's help to locate employment for Fosu, her domestic partner, and when no outside employment options were found, URI appointed him as a visiting professor for the 2019 spring semester. Id., ¶¶ 1, 44. URI appointed Fosu to a faculty of practice to teach in the Political Science Department for the 2019-2020 academic year.[3] Id., ¶ 46. A faculty of practice is a one-year appointment and a non-tenure position. Id., ¶ 2.

Fosu did not have the academic qualifications to teach core curriculum classes in the Political Science Department. Id., ¶ 47. The Chair of the Political Science Department, Professor Marc Hutchison, decided that Fosu could teach elective courses as a faculty of practice. Id., ¶¶ 47 & 48. Fosu was to teach a course on the Supreme Court and constitutional law, and he also proposed a course on advocacy, which was approved. Id., ¶ 49. During the 2019-2020 academic year, Fosu taught elective

[3] The position is called faculty of practice both by defendants and in the Collective Bargaining Agreement. Doc. no. 119 at 4; Doc. no. 119-5, at 7.

undergraduate courses on constitutional law and advocacy and a graduate course. Id., ¶ 54.

B. Fosu's Effort to Influence URI's Decision

In 2019, the position of Chief Diversity Officer at URI was held by Mary Grace Almandrez, on an interim basis. In February of 2020, URI began a search for its next Chief Diversity Officer. Id., ¶ 55. Dean of the College of Arts and Sciences Jeannette Riley co-chaired the search committee for the new Chief Diversity Officer with Vice President of Student Affairs Kathleen Collins. Id., ¶ 56. The committee planned public presentations by three people selected as finalists for the position in mid-February. Id., ¶ 57.

Fosu involved himself in the process for selecting the Chief Diversity Officer, favoring one candidate, Dr. Sylivia Spears. Id., ¶ 58. The interim officer, Mary Grace Almandrez, was also a finalist for the permanent position. Id. The day before Almandrez's scheduled presentation to the search committee, Fosu sent her a twelve-page email with ten attachments, which he also sent to many URI senior administrators, including URI President David Dooley, and to people outside the URI community. Id., ¶¶ 58 & 59.

The email's heading showed Fosu's position at URI, with his URI address, as well as his home address. Doc. no. 119-14,

at 2. It was titled "Notice of Legal Action for Discrimination Based on Race, Sex and Age." Id. The email began:

> It is with profound sadness and grave concern about the dearth of African-American diversity at the University of Rhode Island, that I inform you of our intention to sue you in your capacity as the interim Chief Diversity Officer (CDO). This will be a legal action for social justice based on race, sex, and age discrimination at URI. This action is joined by diverse groups of faculty, students and administrators. It is also part of a hands-on social justice experiential learning project aimed to expand diversity at URI and reflective content for my participatory pedagogy in the classroom where I teach: "U.S. Constitution and the Supreme Court" and "Examining Institutional Power, Checks and Balances, and Advocacy for a More Equitable Society".

Id. Fosu stated that Almandrez's "efforts as Chief Diversity Officer have failed to create a diverse, equitable, and inclusive university for African-Americans to work, learn and thrive, and we intend to make that case in state and federal court." Id.

Fosu went on to assert that Almandrez lacked competence and provided a recitation of his own experience with social justice advocacy. He advised Almandrez on how she should have acted and criticized her efforts and decisions in the position of interim officer. Fosu also attacked Almandrez's ethnicity as Southeast Asian, stating, among other things: "Looking Black does not mean your soul identifies with African-American daily injustice." Id., at 10.

In particular, Fosu challenged Almandrez's handling of the hiring of the Director of Diverse Faculty Recruitment and Retention, largely because Fosu's choice, Dr. Harry Alston, was not hired for that position. He accused Almandrez of making "spurious racist attacks on Dr. Harry Alston's character to derail his candidacy." Id., at 8. Fosu stated that in the lawsuit he planned to file against Almandrez he would demand an audit of the hiring process for the Director position.

Fosu also suggested in his email that he represented the position of a group of URI staff, the Faculty and Staff Association of the African Diaspora ("FSAAD"). Following receipt of the email, several members of FSAAD denied that Fosu spoke for them. Doc. no. 119-15. President Dooley and the search committee selected Almandrez as the Chief Diversity Officer. Doc. no. 119-3, at 13.

C. Reappointment and Teaching

During the 2020 spring semester, URI reviewed Fosu's teaching for purposes of reappointment, and Professor Marc Hutchison, chair of the Political Science Department, gave a positive annual review of Fosu's teaching. Hutchison also wrote that the Political Science Department supported Fosu's reappointment. Dean Riley also reviewed Fosu's work and wrote a positive review. Fosu was reappointed as a faculty of practice

in the political Science Department for the 2020-2021 academic year.

For the fall semester of 2020, Fosu taught two elective courses in the Political Science Department. Fosu did not attend the Department's first two faculty meetings that were held in September and October without asking to be excused. He also did not communicate with Hutchison. During the same time, Fosu was creating a private corporation, "Diversity Think Tank," that he incorporated on September 8, 2020.

D. Diversity Think Tank, Declaration of Diversity, and Emails

On October 26, 2020, Fosu sent an email titled "Declaration of Diversity" to URI President Dooley, along with many others including members of the URI faculty and staff, URI students, law enforcement officials, and government officials. Doc. no. 119-17. Fosu again targeted the Chief Diversity Officer, Mary Almandrez, and criticized the hiring process involving Dr. Sylvia Spears and Dr. Harry Alston. He accused the URI faculty and staff of racism, collusion, unethical conduct, and violations of the law. The email included a boxed warning that "all parties mentioned in this letter and involved in the Dr. Harry Alston and Dr. Sylvia Spears interview process must not shred or destroy any documents, must not delete any emails or electronic messages from November 1, 2019 to present." Id.,

at 2. Fosu also asserted that he and others invoked their Fourth Amendment rights.

In the email, Fosu notified President Dooley that Fosu's private corporation, Diversity Think Tank, was "headquartered" at URI and that it was the corporation's goal "to directly target and expose URI's indefensible and offensively prejudicial and discriminatory policies and the people who perpetuate intentional racism and normalized racist inequities through the machinations of white supremacy." Id., at 7. He attached thirteen exhibits to the email, including his prior email sent to Almandrez and others, titled "Notice of Legal Action for Discrimination Based on Race, Sex and Age" with its exhibits.

One of the email exhibits was "Declaration of Diversity" that purported to be issued by "organized URI students." Doc. no. 119-17, at 11-31. The Declaration began with a statement that "We as organized URI student, hold these facts to be self-evident, that there is a deliberate and racist dehumanizing exclusion of highly qualified African-Americans/Blacks, Latinos/Hispanics and Native Americans from positions of senior leadership and other positions throughout the university, including Administrative Staff, Deans, Department Chairs, Faculty, Functional Staff and Students." Id. at 11. The Declaration argued in favor of Fosu's preferred candidates for offices at URI, Dr. Harry Alston, Jr. and Dr. Sylvia Spears, and

against Chief Diversity Officer Mary Almandrez. The Declaration also included a list of 46 "complaints and demands." Id., at 14-31. The ninth demand stated:

> We students will create a White-list of all those white professors who define and list themselves as diversity initiative conveners, race experts and researchers while they are silent and benefit from white supremacy and racism at URI, self-evident by the fact that no African-American with an ancestry to slavery and no Latino has been hired to a senior leadership position since 1892—and NOT ONE WHITE FACULTY member has expressed a problem with that fact, and the glaring fact that there are NO BLACK FACULTY members in the Criminal Justice Department and only a couple at the Harrington School. You white professors do not need research to find out about systemic racism at URI—you are part and parcel of the creation and maintenance of systemic racism at URI though your self-serving policies, unapologetic excuses, discriminatory behavior and your hegemonic culture of impunity. You should be ashamed of yourselves and we will help end this metastasized disease of racism. Your panel discussions about diversity and ethics should be our panel discussions about diversity and ethics, and we pick who should be on these panels.

Doc. no. 119-17, at 17. The Declaration was signed by four URI students who were identified as Diversity Think Tank trustees, non-student trustees of Diversity Think Tank, and Fosu.

Several of the faculty expressed concern to the department chair, Professor Hutchison, about the email and the Declaration of Diversity. Hutchison met with Fosu on October 30, 2020, to discuss his lack of participation in the Department and the October 26 email. During the meeting, Hutchison and Fosu discussed steps the Department could take to promote diversity

and scholarship opportunities. They also discussed Fosu's complaints about his treatment in the Department and statements made in the Declaration of Diversity, including the intent to make and publish "white lists" to expose white professors who are involved in diversity issues but benefit from white supremacy and racism at URI.

Fosu attended the Political Science Department's meeting on November 6, 2020. Doc. no. 119, ¶ 112. During the meeting Fosu talked over other faculty and talked about bringing in his army of lawyers. The faculty felt that if they disagreed with Fosu, he labeled them racist.

On November 7, 2020, Fosu sent an email to faculty in the Political Science Department, following up on his remarks during the November 6 meeting. He criticized his treatment during the meeting and asserted that the faculty had to stand against racism or they supported racism. He also called out individual faculty members to refute their positions during the department meeting. To one female faculty member, Fosu wrote:

> [R]acism and discrimination are not complex or complicated matters to understand as you mentioned and implied in your job candidate example. . . . Maybe you should reflect and recognize that the highly qualified Black person who interviewed as your search committee's first choice, likely declined the job because s/he wanted to avoid a perceived impending racial conflict and marginalization after encountering the reality of our intensely all-white environment. . . . Step out of your personal defensive mode nurtured naturally by white privilege and empathize with Black

> candidates who walk on this campus. . . . I experienced that subtle disrespect and suspicious questioning during our meeting on Friday.

Doc. no. 119-21, at 5. In response to another faculty member's discussion during the meeting, Fosu wrote: "The main beneficiaries of Affirmative Action have been White women—not Black men and not Black women—cultural hegemony has been very successful at falsely convincing us that Blacks predominately benefit from Affirmative Action." Id., at 6. Fosu further wrote that "[w]hat I was discussing with [a male faculty member] on a deeper level before I was interrupted by [the female faculty member] is that we cannot rely on an institution that has been systemically racist for 128 years to produce progressive policies that advance racial equity." Id.

Hutchison testified in his deposition that Fosu's email caused distress in the department. Doc. no. 119, ¶¶ 116-120. Faculty were concerned that they would be publicly accused of being racist if they taught about race issues in class. Other faculty told Hutchison that the department could not talk with Fosu because he would not hear any point of view except his own. The targeted female faculty member told Hutchison that Fosu was creating a hostile work environment and bullying female colleagues. Hutchison reported the faculty's concerns to Dean Riley who reported the problems to Provost DeHayes. Riley

directed Hutchison to report the female faculty member's concerns to URIS' Title IX officer.

Meanwhile, Fosu sent another email to URI faculty and administration on November 30, 2020, with the subject "Request for Meetings PSC312/Ending 128 years of Systemic Racism at URI." Doc. no. 119-22, at 3. Fosu proposed meetings "on behalf of [his] students as part of the advocacy phase of our class, PSC 312." Id., at 4. Fosu further proposed that his students will negotiate with the email recipients "to end 128 years of systemic racism." Id. He discussed his mother's treatment for breast cancer, analogizing to "cur[ing] the disease of metastasized racism on URI's campus." Id., at 5. Fosu again urged the qualifications of his preferred candidates for diversity positions at URI, Dr. Sylvia Spears and Dr. Harry Alston, and derided URI's Chief Diversity Officer, Mary Grace Almandrez. He also reasserted that affirmative action and the Civil Rights Act primarily benefitted white females in academic institutions, which lead to their "overrepresentation at URI and other academic institutions nationwide." Id. Fosu then proposed a schedule for advocating for the removal of Almandrez from her position as Chief Diversity Officer at URI and procedures to promote Dr. Spears and Dr. Alston.

Following the November 30 email, a member of URI's faculty whom Fosu included as being in support of Fosu's positions, sent

Fosu an email to remove his name. The faculty member wrote that he had requested removal previously and stated that he had "zero interest in remaining a part of this email chain." Doc. no. 119-23, at 5. In response, Fosu sent a multi-page email copied to a large group of URI staff and faculty, that posed a long series of questions to that person that promoted Fosu's issues and agenda and included remarks such as, "do you think our Africana Studies Department should create a committee that educates or re-educates faculty and administrators like you about race in America and the sacrifice African-Americans made with their lives for you to wear a bowtie to act unethically in an 80% White school?" Id., at 4.

On December 8, 2020, Fosu sent yet another email, this one to Provost DeHayes and a long list of other recipients, including members of the Political Science Department, with the subject "Apologize To Us for 128 years of systemic racism." Doc. no. 119-25. Fosu criticized DeHayes for his decision not to meet with Fosu and his class. He again asserted that the Chief Diversity Officer was incompetent and that DeHayes's "offensively racist policies at URI have caused unwarranted damage and harm to African Americans, Latino and Native American job candidates." Doc. no. 119-25, at 5. Fosu defended the Declaration of Diversity and asserted his view of racism at URI.

E. Parent and Student Complaints

A parent of a student in Fosu's class and five students complained about Fosu's instruction and conduct to URI administrators. Students also complained about Fosu's actions to other Political Science Department Faculty and to staff in URI's multicultural student center. On the other hand, two students wrote to Provost DeHayes in support of Fosu.

1. Parent and Student 1

On October 27, 2020, the father of an undergraduate student at URI, who was enrolled in Fosu's constitutional law class, contacted the Office of the Provost to complain about Fosu's practice of cancelling classes and also about Fosu's bias during class. The complaint was referred to Dean Riley, who asked Hutchison to address it as Fosu's department chair. Hutchison responded that he was increasingly concerned about Fosu's lack of communication and detachment from the department but said he would pursue the matter with the student.

Hutchison contacted the student who told Hutchison that the day before Fosu sent an email to students just as class was scheduled to start, saying that he would be late. The class waited for Fosu who never came. The student also was concerned about the content taught during class that the student thought was a biased outlet for Fosu's personal views and was not

focused on constitutional law, the subject of the class. Hutchison also talked with the student's father who confirmed the concerns about cancelling classes and Fosu's biased teaching.

2. Students 2 and 3

During November of 2020, Political Science Department faculty reported to Hutchison that their students were raising concerns about Fosu, and Hutchison told the faculty that the students must contact him directly. Doc. no. 119, ¶ 125. On November 24, 2020, Students 2 and 3 met with Hutchison. The students were in Fosu's constitutional law course and reported that Fosu never set up the expected webpage for the class, that he was untimely in grading and other interactions with students, and that he refused to email with students (which is the primary method of communication between faculty and students outside of class and office hours), and provided no meaningful feedback. They reported that he was ten minutes late to class the previous day. They also reported that Fosu's teaching was biased and that instead of teaching anything about the Supreme Court or the constitution, which were the subjects of the class, he "yelled about racism." Doc. no. 119-19, at 5.

3. Student 4

On December 1, 2020, a fourth student met with Vice President of Student Affairs Kathy Collins to report student concerns about Fosu's class. Doc. no. 119, ¶ 140. That student requested anonymity because of concern about retribution from Fosu and expressed fear on the students' behalf generally. Collins summarized that student's report, as follows:

> 1. Declaration for Diversity was pre-written by Mr. Fosu and taken to class in September, 2020. Students were able to do edits and provide comments in a google doc. None of their comments and edits were accepted into the document. The student [I] spoke with has not "seen the document since September." When students asked if they could edit it, they were told, "no."
> 2. The petition that is up on change.org was circulated in class and students were told to sign at the start of a recent class. Students did not write the petition.
> 3. Multiple students have requested of Mr. Fosu to have their names removed from documents, emails, etc. They were informed by Mr. Fosu that their names could not be removed. He shared that they were "legally required to be named because" they "reviewed the document."
>
> The student also shared:
> - students are "very fearful about grades"
> - students are "uncomfortable in class" - especially with the "misogyny"
> - the student expressed that the class was full of "extreme radicalism"
> - the student expressed that Mr. Fosu sees students as "collateral damage."

Doc. no. 119-24, at 2.

Student 4 then met with Hutchison, reporting that Fosu intimidated students into going along with the Declaration of

Diversity. Doc. no. 119, at ¶ 141. The student said that students were not allowed to have a voice. Student 4 reported misogyny in Fosu's treatment of female students. Student 4 also reported that Fosu uses "inappropriate and crude language in class," which made Student 4 uncomfortable, and that they had received inappropriate emails and requests. Doc. no. 119-19, at 7. In addition, the student said that Fosu cancelled classes without warning. Student 4 explained that the class Hutchison attended on November 13 was not a normal class.

Student 4 met with Provost DeHayes on December 4, 2020, and again asked for anonymity because of concern about retaliation from Fosu. Doc. no. 119, ¶ 149. The student told Provost DeHayes that Fosu, not the students, wrote the Declaration of Diversity and that he rejected students' input. Student 4 said that although initially they were interested in working with Fosu on diversity, the experience was different from what they expected.

4. Student 5

Student 5 who was in Fosu's advocacy class met with Hutchison on December 4, 2020. Doc. no. 119, ¶ 152. Student 5 told Hutchison that Fosu limited their advocacy projects to issues in his Diversity Think Tank and told them that it would be unethical for them to work on any other matters. Student 5

also did not like Fosu's publication of their name in Fosu's communications without their permission. Student 5 said that other students were not aware that Fosu was publicizing their names and using their names to promote his own agenda. As an example, Student 5 described a Zoom class when Fosu abruptly stopped the class to have the students sign a petition that Fosu supported. Student 5 also took issue with Fosu including their name in Fosu's email and did not like the implication from that use of their identity. Like the other students, Student 5 reported concern about retaliation from Fosu and that they were intimidated by him.

5. Student Support

On December 8, 2020, two students wrote to Provost DeHayes to support Fosu. Doc. no. 119, ¶ 172. They said that they freely contributed to Fosu's Diversity Think Tank. DeHayes was concerned about the other students' complaints, and the student support did not change that concern.

F. Fosu Requests Meeting for Presentation of Declaration of Diversity

On December 6, 2020, Fosu sent an email to Provost DeHayes asking for a meeting with Fosu and his students to present the Declaration of Diversity. Doc. no. 119, ¶ 167. DeHayes and URI

President Dooley responded that normally they would be pleased to meet with Fosu's class but "the document that you refer to as the Declaration of Diversity was written by you and represents your opinions being imposed on students and others." Doc. no. 119-25, at 3. They further stated that "the document includes numerous inaccurate statements as well as unwarranted, unsubstantiated, and defamatory personal attacks on several members of the URI community . . . [and] causes unwarranted damage to the good name and reputation of the University." Id. DeHayes and Dooley declined the invitation and further stated that "we are deeply disappointed that you have put our students in a position of having to promote and/or defend your personal agenda." Id.

### G. Faculty and Administration's Response to Complaints and Fosu's Communications

Provost DeHayes consulted with President Dooley and other senior administrators about the student and faculty concerns and complaints. Doc. no. 119, ¶ 164. President Dooley was particularly concerned that Fosu's public disparagement of URI community members (e.g., calling certain faculty and administrators racists) impeded URI's work and found those attacks to be alarming. Id., ¶ 165. Because of their concerns about the impact on Fosu's students if he were removed in

December at the end of the semester, the administrators decided not to take action until after Fosu submitted grades for the 2020 fall semester.

On December 10, 2020, URI sent a letter to Fosu to notify him that he had violated URI's Acceptable Use Policy. In particular, the notice cited Fosu's use of URI's intellectual technology resources including URI email to communicate the opinions of Fosu's nonprofit corporation, Diversity Think Tank. He was directed to stop using the URI email system to attack members of the URI community, for excessive personal use, and for any use by or on behalf of the Diversity Think Tank.

After Fosu submitted the course grades for his fall semester classes, Provost DeHayes consulted with President Dooley and other senior administrators and concluded that URI must remove Fosu from his teaching assignments for the spring 2021 semester. DeHayes and the other administrators also concluded that there was no realistic way that Fosu could continue to teach at URI after his one-year appointment terminated at the end of the spring semester.

DeHayes decided to have an investigation done by an external investigator to determine whether URI could terminate Fosu's employment before the end of the spring semester. When URI opened after the holidays, DeHayes's office tried to contact Fosu by email, telephone, and text messages without success. On

January 12, 2021, DeHayes sent Fosu a letter that placed him on administrative leave with pay. He directed Fosu not to teach or otherwise engage in activities related to his employment at URI. DeHayes also communicated with the faculty union's representative and sent him a memorandum that summarized the reports about Fosu.

### H. Resignations from the Diversity Think Tank and Fosu's Response

In December of 2020 and continuing into January of 2021 four of the six URI students who signed the Declaration of Diversity as trustees of Fosu's Diversity Think Tank resigned from the Diversity Think Tank. The students asked Fosu to remove their names from all Diversity Think Tank materials. In their resignation emails, the students explained that they did not agree with Fosu's goals and actions and that he had sidelined the students' interests.

Fosu responded to the first student and everyone else on the email list in a long email with multiple references to the student as a white man and saying "[o]nly a person who is very privileged would make a false statement that I do not have the best interests of students." Doc. no. 119-28, at 2. Fosu's response to the resignation of the other three students identified them by name, and, included URI community members

beyond Diversity Think Tank. Fosu stated that he forgave the students for their "fabrications, ulterior motives and for the pusillanimity of [their] incoherent email." Doc. no. 119-29, at 4. He also said that that "this collective tantrum from you three, is because I shut down your childhood friend and frat brother [the first student to resign] . . . [and] [t]he next [he] has a difference of opinion or disagreement with any Black/African American man of my caliber he will know how to speak properly and disagree respectfully." Id. At the end of January, another student resigned from the Diversity Think Tank referencing Fosu's responses as "accusatory, disagreeable behavior." Doc. no. 119-29, at 19.

Fosu's response to the students was forwarded to the Vice President of Student Affairs, who shared it with Marc Hutchison. Hutchison was upset by Fosu's attack on the students in the email. In one of the emails, he referred by name to two of the students who had asked that their names be removed from the Diversity Think Tank and not used. On April 16, 2021, Provost DeHayes terminated Fosu's access to URI email.

I. Administrative Leave

Provost DeHayes issued a letter to Fosu on January 12, 2021, placing Fosu on administrative leave with pay. Doc. no. 119-26. DeHayes notified Fosu that he was relieved of all of

his URI obligations, effective immediately, and directed him to "refrain from all University related work." Id. DeHayes explained that the administrative leave decision was made

> because of very serious concerns arising from various credible complaints, allegations, reports, and communications that have been received by several University officials. Some of these concerns were referenced in my two prior letters to you. Our serious concerns relate to certain aspects of (1) your behavior and interactions with students in your classes, such as assertions of coercion, exploitation, and intimidation relating to student expression that obstruct the free pursuit of learning for students; and, (2) your behavior as an employee and your interactions and communications with University faculty and staff, including individuals in your department, that have been hostile, disrespectful and/or noncollegial as well as disruptive to departmental and university functions and operations, and potentially damaging to the reputation of individuals and the university.

Id. DeHayes further stated that that URI was investigating further. He also stated that placing Fosu on "administrative leave will ensure that such behaviors do not continue to have disruptive or deleterious impacts on University operations or members of the University community at this time." Id.

Despite being on administrative leave and having been notified of URI's Acceptable Use Policy for email, Fosu continued to issue emails to large groups using his URI email. Four students contacted Vice President Collins to complain about Fosu's continued publication of their names in association with his Diversity Think Tank without their permission. Doc. no.

119, ¶ 217. Because of this continuing misconduct, Provost DeHayes terminated Fosu's access to URI email. Id., ¶ 218.

J. External Investigation

URI hired an attorney to investigate the circumstances surrounding Fosu and to determine whether grounds existed under the Collective Bargaining Agreement to terminate Fosu before his one-year appointment ended. The attorney interviewed Fosu's students and URI administrators. He prepared a 73-page report that the URI administration received too close to the end of the 2021 semester to use for the purpose of an early termination of Fosu's appointment.

K. Nonrenewal of Fosu's Appointment

Provost De Hayes notified Fosu on May 19, 2021, that his one-year appointment as faculty of practice would not be renewed. Doc. no. 119-32. In the letter, De Hayes stated that the independent investigation of the concerns and complaints about Fosu had been completed. He further stated that the report found the following actions by Fosu were especially concerning:

> coercion, intimidation, and retaliation toward students limiting their free pursuit of learning;
>
> public expressions of hostility, harassment, and disrespectful and threatening behavior toward

> colleagues, and disrespect for opinions that are divergent from your own;
>
> disruption of departmental processes and overt efforts on your part to interfere with formally sanctioned university processes and procedures.

Id. DeHayes wrote that as Fosu had been told previously, his actions violated URI's Acceptable Use Policy and the requirements of the Family Educational Rights and Privacy Act. URI continued Fosu's paid administrative leave through the end of the one-year appointment, June 19, 2021.

## Discussion

Defendants move for summary judgment on Fosu's claims on the merits and also raise qualified immunity as to Fosu's First Amendment claim in Count I. Summary judgment is granted on the federal claims, and the court declines supplemental jurisdiction over the state law claims.

### A. Section 1983 Claims - Counts I and II

Fosu alleges in Count I that defendants violated his First Amendment right to free speech by placing him on administrative leave and then not reappointing him to his faculty of practice position in retaliation for his expressed opinions on race, diversity, justice, and inclusion. In Count II, Fosu alleges that defendants discriminated against him by denying him a forum

for his views. Because these claims are denied on the merits, it is not necessary to address qualified immunity.

1. First Amendment – Count I

"The right to speak on matters of public concern is guaranteed by the First Amendment."[4] MacRae v. Mattos, 106 F.4th 122, 132 (1st Cir. 2024). Speech by public employees, however, is subject to "restrictions that are necessary for their employers to operate efficiently and effectively." Garcetti v. Ceballos, 547 U.S. 410, 419 (2006). The Supreme Court has formulated a multi-part test for public employee First Amendment claims "to promote the individual and societal interests that are served when employees speak as citizens on matters of public concern and to respect the needs of government employers attempting to perform their important public functions." Id., at 420.

At the first step, the court determines "whether the employee spoke as a citizen on a matter of public concern."

[4] The First Circuit standard for First Amendment cases brought by public employees is in the process of rehearing en banc. See Hussey v. City of Cambridge, 165 F.4th 638 (2026) 149 F.4th 57 (1st Cir. 2025); see also MacRae v. Mattos, 606 U.S. ---, 145 S. Ct. 2617 (2025) (statement of Justice Thomas respecting denial of certiorari, discussing and criticizing the First Circuit Court of Appeals application of the standard). The standard existing prior to the vacated decision in Hussey applies in this case.

Id., at 418. If not, the First Amendment claim fails. Id. At the second step, the court determines "whether the relevant government entity had an adequate justification for treating the employee differently from any other member of the general public," which requires balancing the employee's interests as a citizen and the state's interests as the employer. MacRae, 106 F.4th at 133. The second step is known as Pickering balancing, referring to in Pickering v. Board of Education of Township High School District 205, Will County, 391 U.S. 563, 568 (1968). Id. If the balancing weighs in favor of the employee, the employee's speech is protected, and the court continues to the third step. Id. The first two steps are decided by the court as a matter of law. Guilloty Perez v. Pierluisi, 339 F.3d 43, 51 (1st Cir. 2003).

At the third step, the court determines "whether the employee's protected speech was a substantial or motivating factor in the adverse employment decision." Id. (internal quotation marks omitted). "Even if the plaintiff satisfies their burden at all three steps, the employer then has the opportunity to prove by a preponderance of evidence that it would have reached the same decision regarding the adverse employment event even in the absence of the protected conduct." Id. (internal quotation marks omitted).

Defendants argue that Fosu cannot establish that he spoke as a citizen on matters of public concern at the first step as to all of his speech and that he cannot establish that all of his speech was protected at the second step under the Pickering balancing test. At the outset, it is somewhat unclear what speech Fosu contends is protected under the First Amendment and is the basis for his First Amendment retaliation claim. The court assumes that Fosu asserts First Amendment protection for the following communications:

1. February 13, 2020 email with the subject "Notice of Legal Action for Discrimination Based on Race, Sex and Age" (Almandrez email).

2. October 26, 2020, email with the subject "Declaration of Diversity."

3. The "Declaration of Diversity."

To the extent Fosu also claims protection generally for speech that occurred during class or for other group emails, he has not provided specific information to support that basis for the claim.[5]

[5] If Fosu intended to claim First Amendment protection for his widely dispersed emails aimed at his dissatisfaction with the administration about its response to the Declaration of Diversity, those who left the Diversity Think Tank, and those who refused to join in his communications, he has not provided any argument in support. Further, those communications focus on Fosu's private concerns and grievances rather than matters of public interest. His claim does not include those matters.

a. First Step – Speaking as a Citizen on a Matter of Public Concern

The analysis at the first step has two parts. Plaintiff must have spoken as a private citizen, not as a public employee. Garcetti, 547 U.S. at 421-22. Then, plaintiff must also have spoken on a matter of public concern. Lane v. Franks, 573 U.S. 228, 241 (2014).

As an employee of URI, Fosu was a public employee. A public employee does not engage in protected speech when he makes statements pursuant to his official duties because "[r]estricting speech that owes its existence to a public employee's professional responsibilities . . . simply reflects the exercise of employer control over what the employer itself has commissioned or created." Garcetti, 547 U.S. at 421-22. The Supreme Court, however, suggested that an exception may exist to the official duty test in the academic context "involving speech related to scholarship or teaching," particularly in public colleges and universities. Id., at 425; Local 8027, AFT-N.H., AFL-CIO v. Edelbut, 651 F. Supp. 3d 444, 452 (D.N.H. 2023). While the First Circuit Court of Appeals has not addressed the application of the official duty test under Pickering and Garcetti to public university professors, other circuit courts have done so and have concluded that First

Amendment claims by public university professors based on speech in the academic context may be actionable. See Pernell v. Fla. Bd. of Governors of State Univ., 181 F.4th 1135, 1152 (11th Cir. 2026); Reges v. Cauce, 175 F.4th 1014, 1035 (9th Cir. 2026); Kilborn v. Amiridis, 131 F.4th 550, 558 (7th Cir. 2025); Josephson v. Ganzel, 115 F.4th 771, 786 (6th Cir. 2024); Heim v. Daniel, 81 F.4th 212, 221 (2d Cir. 2023); Porter v. Bd. of Trs. of N. Carolina State Univ., 72 F.4th 573, 582 (4th Cir. 2023).

Those decisions are persuasive. Despite the lack of a decision on point from the First Circuit, the court assumes that Fosu's speech falls within the scholarship and teaching exception suggested in Garcetti. The next part of the first step analysis is whether Fosu spoke on a matter of public concern.

"Speech involves matters of public concern when it can be fairly considered as relating to any matter of political, social, or other concern to the community, or when it is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public." Lane, 573 U.S. at 241. Speech on public corruption, governmental malfeasance, neglect of duties by government employees, and governmental inefficiency all qualify as public concerns. Briggs v. Town of Ashland, 828 F. Supp. 3d 149, 160 (D. Mass. 2026) (citing cases). "Whether an employee's speech addresses a

matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record." Connick v. Myers, 461 U.S. 138, 147-48 (1983).

Assuming that the protected communications Fosu claims are the Almandrez email, the October 26 email, and the Declaration of Diversity, parts of those communications raise matters of public concern.

b. Second Step – Balancing Interests

At the second step, the court balances "the value of an employee's speech—both the employee's own interests and the public's interest in the information the employee seeks to impart—against the employer's legitimate government interest in preventing unnecessary disruptions and inefficiencies in carrying out its public service mission." Decotiis v. Whittemore, 635 F.3d 22, 35 (1st Cir. 2011) (internal quotation marks omitted). In weighing the employer's interests, "the court should include in its considerations (1) the time, place, and manner of the employee's speech, and (2) the employer's motivation in making the adverse employment decision." Id. (internal quotation marks omitted).

Here, Fosu's interest in racism at URI is a hot-button political issue. MacRae, 106 F.4th, at 137. Similarly, his concerns about diversity in hiring and in the student body at

URI are recognized public issues. Nevertheless, under the current rule in the First Circuit, "[s]peech done in a vulgar, insulting, and defiant manner is entitled to less weight in the Pickering balancing." Id. Fosu's emails and much of the Declaration of Diversity are insulting to Chief Diversity Officer Almandrez and others and include personal attacks and denigrating remarks about individuals and URI faculty and administration. Those communications generally are entitled to less weight for purposes of balancing interests.

On the other side of the balance, URI put Fuso on administrative leave because of his misconduct. Specifically,

> coercion, intimidation, and retaliation toward students limiting their free pursuit of learning;
> public expressions of hostility, harassment, and disrespectful and threatening behavior toward colleagues, and disrespect for opinions that are divergent from your own;
> [and] disruption of departmental processes and overt efforts on your part to interfere with formally sanctioned university processes and procedures.

Doc. no. 119-32. URI had a compelling interest in implementing its educational goals, including providing instruction to its students as scheduled and without intimidation or other inappropriate classroom conduct.[6] MacRae, 106 F.4th 122, 137

---

[6] The court is aware that "'[v]igilance is necessary to ensure that public employers do not use authority over employees to silence discourse, not because it hampers public functions but simply because superiors disagree with the content of employees' speech.'" Damiano v. Grants Pass Sch. Dist. No. 7, 140 F.4th 1117, 1147 (9th Cir. 2025) (quoting Rankin v.

(recognizing school's "interest in preventing disruption to the learning environment"). URI also had a compelling interest in avoiding disruption of its faculty and administration. See, e.g., Hedgepeth v. Britton, 152 F.4th 789, 797 (7th Cir. 2025) (holding that school's "interest in addressing actual disruptions and averting future disruption outweighed [plaintiff's] speech interests); Griffin v. Univ. of Maine Sys., No. 22-cv-00212, 2025 WL 1261167, at *8 (D. Me. Apr. 30, 2025); Manchester v. Town of Ludlow, 780 F. Supp. 3d 296, 309 (D. Mass. 2025) (recognizing a school's "strong interest in preserving a collegial atmosphere, harmonious relations among teachers, and respect for the curriculum")."

In addition, the decisions by URI administrators to first put Fosu on paid administrative leave and then not to reappoint him as a faculty of practice were the result of Fosu's conduct that caused complaints from his students and caused disruption at URI, as demonstrated in the record. Fosu frequently was late to class and cancelled class. His students were intimidated by him and afraid of retribution if they did not agree with and participate in his agenda and his company, the Diversity Think Tank. Faculty in the Political Science Department found him to

McPherson, 483 U.S. 378, 384 (1983)). In this case, however, the extreme nature of Fosu's speech diminishes the weight afforded to his expressive interests.

be uninvolved and disruptive when he was involved. Fosu expressed misogynistic views that intimidated his students and faculty in his department. When he was directed not to use URI technology to advance his personal issues and agenda, he continued to do so. The URI administration spent considerable amounts of time addressing the problems that Fosu caused.

Therefore, the balance of interests strongly favors defendants. As a result, Fosu has not demonstrated that his speech is entitled to First Amendment Protection. Defendants are entitled to summary judgment on Count I.

2. Equal Protection – Count II

To succeed on an equal protection claim, a plaintiff must prove that (1) compared with others similarly situated, "[he] was selectively treated; and (2) that such selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person." Davis v. Coakley, 802 F.3d 128, 132-33 (1st Cir. 2015) (internal quotation marks omitted). Importantly, an equal protection claim cannot be a mere restatement of a First Amendment retaliation claim based on the same facts. Rosaura Bldg. Corp. v. Municipality of Mayaguez, 778 F.3d 55, 68 (1st Cir. 2015).

Fosu alleges that by restricting his speech in violation of the First Amendment, "Defendants have unconstitutionally deprived [him] of the equal protection of the law guaranteed by the Fourteenth Amendment." Doc. no. 36, ¶ 98. He also alleges that defendants disciplined him "differently and more harshly than similarly situated professors at URI." Id., ¶ 99. To the extent Fosu's equal protection claim is based on his First Amendment retaliation claim, it fails. Further, Fosu provides no facts to show that defendants treated him differently based on impermissible consideration or that others, similarly situated, were treated differently.

Therefore, defendants are entitled to summary judgment on Count II.

B. Title VII - Counts V and VI

Fosu alleges that URI and its Board of Trustees violated Title VII of the Civil Rights Act of 1964 by terminating his employment because of his race and by retaliating against him for asserting that URI had a record of racial discrimination. The record facts do not support either claim.

1. Racial Discrimination

To state a Title VII claim of employment discrimination, a plaintiff must present sufficient evidence to show that "(1)

[he] belonged to a protected class, (2) [he] performed [his] job satisfactorily, (3) [his] employer took an adverse employment decision against [him], and (4) [his] employer continued to have his duties performed by a comparably qualified person." Russo v. N.H. Neurospine Inst., P.A., No. 25-1519, 2026 WL 2491680, at *6 (1st Cir. Aug. 25, 2026). If the plaintiff makes a prima facie case, "the burden shifts to the Defendants, who must state a legitimate, nondiscriminatory reason for the adverse employment actions." Id. (internal quotation marks omitted). If defendants make that showing, they are entitled to summary judgment unless plaintiff "raises a genuine issue of material fact that the reasons offered by the defendants were a pretext for discrimination." Id. (internal quotation marks omitted).

Defendants do not dispute that Fuso can establish a prima facie case.[7] They contend, however, that based on Fuso's conduct they had ample legitimate grounds to place him on administrative leave and not renew his appointment. The court agrees.

The record establishes that defendants put Fosu on administrative leave and did not renew his one-year appointment because of his misconduct and the disruption he caused at URI.

---

[7] Because Fosu did not provide a factual statement or otherwise respond to the motion for summary judgment, he has not provided any factual basis to support his claims. Nevertheless, the court will assume that Fosu could establish a prima facie case.

Nothing suggests that Fosu's race played any part in the employment decisions. As such, the undisputed facts provide no basis to suggest that defendants' employment decisions were a pretext for racial discrimination. Defendants are entitled to summary judgment on Count V.

2. Retaliation

Title VII also prohibits retaliation against a person who complains about discriminatory employment practices. Kinzer v. Whole Foods Mkt., Inc., 99 F.4th 105, 114-15 (1st Cir. 2024). The prima facie case framework applies to Title VII retaliation claims. Farid v. Trs. of Dartmouth Coll., 181 F.4th 193, 208 (1st Cir. 2026). In the retaliation context, a plaintiff must demonstrate "that (1) the plaintiff engaged in protected conduct, (2) the employer took an adverse employment action, which was (3) in response to the employee's protected activity." Id. (internal quotation marks omitted). If the plaintiff establishes a prima facie claim, "the burden shifts to the defendant to articulate a legitimate, non-retaliatory explanation for its actions." Id. (internal quotation marks omitted). Then, "the plaintiff must show that the defendant's explanation is a pretext . . . [and] that retaliatory animus was the real motivating factor." Id. (internal quotation marks omitted).

Defendants contend that Fosu cannot establish that the defendants' adverse actions were taken in response to his protected speech or that they acted with retaliatory animus.[8] The record does not demonstrate a causal relationship between Fosu's statements about racial discrimination in employment at URI and defendants' decisions to terminate his employment at URI. Because Fosu's communications about URI's discriminatory employment practices began with his email to Almandrez in February of 2019 and he was not put on administrative leave until almost a year later, close temporal proximity is lacking. See Stratton v. Bentley Univ., 113 F.4th 25, 45 (1st Cir. 2024). In addition, URI provided the same reasons for putting Fosu on administrative leave and for not renewing his appointment. Fosu has not shown any inconsistency in URI's explanations for those actions. Therefore, Fosu has not met even the relatively light burden of establishing a prima facie case.

Even if he were able to do so, the record lacks evidence that defendants' explanation for the actions terminating Fosu's

---

[8] Defendants argue that but-for causation is necessary to establish the third element of a prima facie case of retaliation. A but-for causation link between protected activity and adverse action is a required element to prove a retaliation claim on the merits. Russo, 2026 WL 2491680, at *12. For purposes of a prima facie case, the burden to prove causation is "relatively light" and may be shown by circumstantial evidence, such as a close temporal proximity, among other circumstances. Román v. Hyannis Air Serv., Inc., 156 F.4th 18, 28 (1st Cir. 2025).

employment was a pretext for retaliation. The record demonstrates that defendants had ample reason to put Fosu on administrative leave and to not renew his appointment as stated in the letter to Fosu:

> coercion, intimidation, and retaliation toward students limiting their free pursuit of learning;
>
> public expressions of hostility, harassment, and disrespectful and threatening behavior toward colleagues, and disrespect for opinions that are divergent from your own;
>
> [and] disruption of departmental processes and overt efforts on your part to interfere with formally sanctioned university processes and procedures.

Doc. no. 119-32. Defendants never referenced Fosu's statements about discriminatory hiring at URI as a basis for their decisions. Fosu has shown no causal relationship between his expressions about discriminatory hiring and the defendants' decision. Instead, Fosu's misconduct caused defendants to end his employment at URI. Defendants are entitled to summary judgment on Counts V and VI.

C. Remaining Claims

Federal subject matter jurisdiction in this case is based on there being a federal question. See 28 U.S.C. § 1331. Because defendants are entitled to summary judgment on all of Fosu's federal claims, the court may decline to exercise supplemental jurisdiction over Fosu's state law claims. 28

U.S.C. § 1367(c); see also Lambert v. Fiorentini, 949 F.3d 22, 29 (1st Cir. 2020). Therefore, the state law claims are dismissed without prejudice for lack of subject matter jurisdiction.

## Conclusion

For these reasons, defendants' motion for summary judgment (doc. no. 118) is granted as to the federal claims, Counts I, II, V, and VI. The remaining state law claims are dismissed without prejudice.

Plaintiff's motion to unseal certain documents (doc. no. 134) is denied.

Plaintiff's motions to clarify or correct previous orders (doc. nos. 136 & 137) are denied.

The clerk of court shall enter judgment accordingly and close the case.

SO ORDERED.

Steven J. McAuliffe
United States District Judge
Sitting by Designation

September 21, 2026

cc: Louis Kwame Fosu, pro se
Counsel of Record